RILEY, DISTRICT ATTORNEY OF THE TENTH PROS-
ECUTORIAL DISTRICT OF NORTH CAROLINA, ET AL.
*v.* NATIONAL FEDERATION OF THE BLIND
OF NORTH CAROLINA, INC., ET AL.

No. 87–328.   Argued March 23, 1988—Decided June 29, 1988

782

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, and KENNEDY, JJ:, joined, in Parts I, II, and III, of which STEVENS, J., joined, and in all but n. 11 of which SCALIA, J., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 803. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 804. REHNQUIST, C. J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 804.

*Lacy H. Thornburg*, Attorney General of North Carolina, argued the cause for appellants. With him on the briefs were *Jean A. Benoy*, Senior Deputy Attorney General, and *Charles M. Hensey*, Special Deputy Attorney General.

*Errol Copilevitz* argued the cause for appellees. With him on the brief was *John P. Jennings, Jr.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Indiana et al. by *Linley E. Pearson*, Attorney General of Indiana, *David A. Miller*, *Christine M. Page*, and *David M. Sommers*, Deputy Attorneys General, and *Charlie Brown*, Attorney General of West Virginia; and for the State of Maine et al. by *James E. Tierney*, Attorney General of Maine,

JUSTICE BRENNAN delivered the opinion of the Court.

The North Carolina Charitable Solicitations Act governs the solicitation of charitable contributions by professional fundraisers. As relevant here, it defines the prima facie "reasonable fee" that a professional fundraiser may charge as a percentage of the gross revenues solicited; requires professional fundraisers to disclose to potential donors the gross percentage of revenues retained in prior charitable solicitations; and requires professional fundraisers to obtain a license before engaging in solicitation. The United States Court of Appeals for the Fourth Circuit held that these aspects of the Act unconstitutionally infringed upon freedom of speech. We affirm.

I

Responding to a study showing that in the previous five years the State's largest professional fundraisers had retained as fees and costs well over 50% of the gross revenues collected in charitable solicitation drives, North Carolina amended its Charitable Solicitations Act in 1985. As amended, the Act prohibits professional fundraisers from retaining an "unreasonable" or "excessive" fee,[1] a term defined by a three-tiered schedule.[2] A fee up to 20% of the gross

and *Stephen L. Wessler*, Assistant Attorney General, *Joseph J. Lieberman*, Attorney General of Connecticut, and *David E. Ormstedt*, Assistant Attorney General.

Briefs of *amici curiae* urging affirmance were filed for the Alabama Sheriffs' Association et al. by *Eric J. Magnuson;* for the California Council of the Blind by *Barry A. Fisher* and *David Grosz;* and for Independent Sector et al. by *Thomas R. Asher* and *Adam Yarmolinsky.*

[1] "Fee" for purposes of the statute includes the costs and expenses of solicitation. N. C. Gen. Stat. § 131C–3(5a) (1986).

[2] North Carolina Gen. Stat. § 131C–17.2 (1986) provides:

"(a) No professional fund-raising counsel or professional solicitor who contracts to raise funds for a person established for a charitable purpose may charge such person established for a charitable purpose an excessive and unreasonable fund-raising fee for raising such funds.

"(b) For purposes of this section a fund-raising fee of twenty percent (20%) or less of the gross receipts of all solicitations on behalf of a particu-

receipts collected is deemed reasonable. If the fee retained is between 20% and 35%, the Act deems it unreasonable upon a showing that the solicitation at issue did not involve the "dissemination of information, discussion, or advocacy relating to public issues as directed by the [charitable organization] which is to benefit from the solicitation." Finally, a fee exceeding 35% is presumed unreasonable, but the fundraiser may rebut the presumption by showing that the amount of the fee was necessary either (1) because the solicitation involved the dissemination of information or advocacy on public issues directed by the charity, or (2) because otherwise the charity's ability to raise money or communicate would be sig-

lar person established for a particular charitable purpose is deemed to be reasonable and nonexcessive.

"(c) For purposes of this section a fund-raising fee greater than twenty percent (20%) but less than thirty-five percent (35%) of the gross receipts of all solicitations on behalf of a particular person established for a charitable purpose is excessive and unreasonable if the party challenging the fund-raising fee also proves that the solicitation does not involve the dissemination of information, discussion, or advocacy relating to public issues as directed by the person established for a charitable purpose which is to benefit from the solicitation.

"(d) For purposes of this section only, a fund-raising fee of thirty-five percent (35%) or more of the gross receipts of all solicitations on behalf of a particular person established for a charitable purpose may be excessive and unreasonable without further evidence of any fact by the party challenging the fund-raising fee. The professional fund-raising counsel or professional solicitor may successfully defend the fund-raising fee by proving that the level of the fee charged was necessary:

"(1) Because of the dissemination of information, discussion, or advocacy relating to public issues as directed by the person established for a charitable purpose which is to benefit from the solicitation, or

"(2) Because otherwise ability of the person established for a charitable purpose which is to benefit from the solicitations to raise money or communicate its ideas, opinions, and positions to the public would be significantly diminished.

"(e) Where the fund-raising fee charged by a professional fund-raising counsel or a professional solicitor is determined to be excessive and unreasonable, the fact finder making that determination shall then determine a reasonable fee under the circumstances. . . ."

nificantly diminished. As the State describes the Act, even where a prima facie showing of unreasonableness has been rebutted, the factfinder must still make an ultimate determination, on a case-by-case basis, as to whether the fee was reasonable—a showing that the solicitation involved the advocacy or dissemination of information does not alone establish that the total fee was reasonable. See Brief for Appellants 10–11; Reply Brief for Appellants 2–3.

The Act also provides that, prior to any appeal for funds, a professional fundraiser must disclose to potential donors: (1) his or her name; (2) the name of the professional solicitor or professional fundraising counsel by whom he or she is employed and the name and address of his or her employer; and (3) the average percentage of gross receipts actually turned over to charities by the fundraiser for all charitable solicitations conducted in North Carolina within the previous 12 months.[3] Only the third disclosure requirement is challenged here.

Finally, professional fundraisers may not solicit without an approved license.[4] In contrast, volunteer fundraisers

---

[3] North Carolina Gen. Stat. § 131C–16.1 (1986) states:

"During any solicitation and before requesting or appealing either directly or indirectly for any charitable contribution a professional solicitor shall disclose to the person solicited:

"(1) His name; and,

"(2) The name of the professional solicitor or professional fund-raising counsel by whom he is employed and the address of his employer; and

"(3) The average of the percentage of gross receipts actually paid to the persons established for a charitable purpose by the professional fund-raising counsel or professional solicitor conducting the solicitation for all charitable sales promotions conducted in this State by that professional fund-raising counsel or professional solicitor for the past 12 months, or for all completed charitable sales promotions where the professional fund-raising counsel or professional solicitor has been soliciting funds for less than 12 months."

[4] North Carolina Gen. Stat. § 131C–6 (1986) provides:

"Any person who acts as a professional fund-raising counsel or professional solicitor shall apply for and obtain an annual license from the Depart-

may solicit immediately upon submitting a license application. N. C. Gen. Stat. § 131C–4 (1986). A licensing provision had been in effect prior to the 1985 amendments, but the prior law allowed both professional and volunteer fundraisers to solicit as soon as a license application was submitted.

A coalition of professional fundraisers, charitable organizations, and potential charitable donors brought suit against various government officials charged with the enforcement of the Act (hereinafter collectively referred to as North Carolina or the State), seeking injunctive and declaratory relief. The District Court for the Eastern District of North Carolina ruled on summary judgment that the foregoing aspects of the Act on their face unconstitutionally infringed upon freedom of speech (it also found the Act constitutional in other respects not before us now), and enjoined enforcement of the unconstitutional provisions. 635 F. Supp. 256 (1986). The Court of Appeals for the Fourth Circuit affirmed in a *per curiam* opinion. 817 F. 2d 102 (judgment order), and we noted probable jurisdiction, 484 U. S. 911 (1987).

## II

We turn first to the "reasonable fee" provision. In deciding this issue, we do not write on a blank slate; the Court has heretofore twice considered laws regulating the financial aspects of charitable solicitations. We first examined such a law in *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620 (1980). There we invalidated a local ordinance requiring charitable solicitors to use, for charitable purposes (defined to exclude funds used toward administrative expenses and the costs of conducting the solicitation), 75% of the funds solicited. We began our analysis by categorizing the type of speech at issue. The village argued that charitable solicitation is akin to a business proposition, and therefore constitutes merely commercial speech. We rejected

---

ment [of Human Resources], and shall not act as a professional fund-raising counsel or professional solicitor until after obtaining such license."

that approach and squarely held, on the basis of considerable precedent, that charitable solicitations "involve a variety of speech interests . . . that are within the protection of the First Amendment," and therefore have not been dealt with as "purely commercial speech." *Id.*, at 632. Applying standard First Amendment analysis, we determined that the ordinance was not narrowly tailored to achieve the village's principal asserted interest: the prevention of fraud. We concluded that some charities, especially those formed primarily to advocate, collect, or disseminate information, would of necessity need to expend more than 25% of the funds collected on administration or fundraising expenses. *Id.*, at 635–637. Yet such an eventuality would not render a solicitation by these charities fraudulent. In short, the prevention of fraud was only "peripherally promoted by the 75-percent requirement and could be sufficiently served by measures less destructive of First Amendment interests." *Id.*, at 636–637. We also observed that the village was free to enforce its already existing fraud laws and to require charities to file financial disclosure reports. *Id.*, at 637–638, and nn. 11–12.

We revisited the charitable solicitation field four years later in *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U. S. 947 (1984), a case closer to the present one in that the statute directly regulated contracts between charities and professional fundraisers. Specifically, the statute in question forbade such contracts if, after allowing for a deduction of many of the costs associated with the solicitation, the fundraiser retained more than 25% of the money collected. Although the Secretary was empowered to waive this limitation where it would effectively prevent the charitable organization from raising contributions, we held the law unconstitutional under the force of *Schaumburg*. We rejected the State's argument that restraints on the relationship between the charity and the fundraiser were mere "economic regulations" free of First Amendment implication. Rather, we viewed the law as "a direct restriction on the amount of

money a charity can spend on fundraising activity," and therefore "a direct restriction on protected First Amendment activity." 467 U. S., at 967, and n. 16. Consequently, we subjected the State's statute to exacting First Amendment scrutiny. Again, the State asserted the prevention of fraud as its principal interest, and again we held that the use of a percentage-based test was not narrowly tailored to achieve that goal. In fact, we found that if the statute actually prevented fraud in some cases it would be "little more than fortuitous." An "equally likely" result would be that the law would "restrict First Amendment activity that results in high costs but is itself a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves to be unpopular." *Id.*, at 966–967.

As in *Schaumburg* and *Munson*, we are unpersuaded by the State's argument here that its three-tiered, percentage-based definition of "unreasonable" passes constitutional muster. Our prior cases teach that the solicitation of charitable contributions is protected speech, and that using percentages to decide the legality of the fundraiser's fee is not narrowly tailored to the State's interest in preventing fraud.[5] That much established, unless the State can meaningfully distinguish its statute from those discussed in our precedents, its statute must fall. The State offers two distinctions. First, it asserts a motivating interest not expressed in *Schaumburg* or *Munson:* ensuring that the maximum amount of funds reach the charity or, somewhat relatedly, to guarantee that the fee charged charities is not "unreason-

---

[5] The dissent suggests that the State's regulation is merely economic, having only an indirect effect on protected speech. However, as we demonstrate, the burden here is hardly incidental to speech. Far from the completely incidental impact of, for example, a minimum wage law, a statute regulating how a speaker may speak directly affects that speech. See *Meyer* v. *Grant*, 486 U. S. 414, 421–423, and n. 5 (1988). Here, the desired and intended effect of the statute is to encourage some forms of solicitation and discourage others.

able." Second, the State contends that the Act's flexibility more narrowly tailors it to the State's asserted interests than the laws considered in our prior cases. We find both arguments unavailing.

The State's additional interest in regulating the fairness of the fee may rest on either of two premises (or both): (1) that charitable organizations are economically unable to negotiate fair or reasonable contracts without governmental assistance; or (2) that charities are incapable of deciding for themselves the most effective way to exercise their First Amendment rights. Accordingly, the State claims the power to establish a single transcendent criterion by which it can bind the charities' speaking decisions. We reject both premises.

The first premise, notwithstanding the State's almost talismanic reliance on the mere assertion of it, amounts to little more than a variation of the argument rejected in *Schaumburg* and *Munson* that this provision is simply an economic regulation with no First Amendment implication, and therefore must be tested only for rationality. We again reject that argument; this regulation burdens speech, and must be considered accordingly. There is no reason to believe that charities have been thwarted in their attempts to speak or that they consider the contracts in which they enter to be anything less than equitable.[6] Even if such a showing could be made, the State's solution stands in sharp conflict with the First Amendment's command that government regulation of speech must be measured in minimums, not maximums.

The State's remaining justification—the paternalistic premise that charities' speech must be regulated for their own benefit—is equally unsound. The First Amendment man-

---

[6] North Carolina was apparently surprised to learn of the charities' opposition to its law, and at oral argument could only surmise that the charities had been misinformed regarding the pro-charity nature of the statute. Tr. of Oral Arg. 20–21. Nonetheless, every charity that has stated a position before us in this case (and there are almost 60 of them other than appellees) supports the judgment below.

dates that we presume that speakers, not the government, know best both what they want to say and how to say it. See *Tashjian* v. *Republican Party of Connecticut*, 479 U. S. 208, 224 (1987) (criticizing State's asserted interest in protecting "the Republican party from undertaking a course of conduct destructive of its own interests," and reiterating that government "'may not interfere [with expressions of First Amendment freedoms] on the ground that [it] view[s] a particular expression as unwise or irrational'") (quoting *Democratic Party of United States* v. *Wisconsin ex rel. La Follette*, 450 U. S. 107, 124 (1981)); cf. *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 791–792, and n. 31 (1978) (criticizing State's paternalistic interest in protecting the political process by restricting speech by corporations); *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 97 (1977) (criticizing, in the commercial speech context, the State's paternalistic interest in maintaining the quality of neighborhoods by restricting speech to residents).   "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Thomas* v. *Collins*, 323 U. S. 516, 545 (1945) (Jackson, J., concurring).   To this end, the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government.   We perceive no reason to engraft an exception to this settled rule for charities.

The foregoing discussion demonstrates that the State's additional interest cannot justify the regulation.   But, alternatively, there are several legitimate reasons why a charity might reject the State's overarching measure of a fundraising drive's legitimacy—the percentage of gross receipts remitted to the charity.   For example, a charity might choose a particular type of fundraising drive, or a particular solicitor, expecting to receive a large sum as measured by total dollars

rather than the percentage of dollars remitted. Or, a solicitation may be designed to sacrifice short-term gains in order to achieve long-term, collateral, or noncash benefits. To illustrate, a charity may choose to engage in the advocacy or dissemination of information during a solicitation, or may seek the introduction of the charity's officers to the philanthropic community during a special event (*e. g.*, an awards dinner). Consequently, even if the State had a valid interest in protecting charities from their own naiveté or economic weakness, the Act would not be narrowly tailored to achieve it.

The second distinguishing feature the State offers is the flexibility it has built into its Act. The State describes the second of its three-tiered definition of "unreasonable" and "excessive" as imposing no presumption one way or the other as to the reasonableness of the fee, although unreasonableness may be demonstrated by a showing that the solicitation does not involve the advocacy or dissemination of information on the charity's behalf and at the charity's direction. The State points out that even the third tier's presumption of unreasonableness may be rebutted.

It is important to clarify, though, what we mean by "reasonableness" at this juncture. As we have just demonstrated, *supra*, at 790–791 and this page, the State's generalized interest in unilaterally imposing its notions of fairness on the fundraising contract is both constitutionally invalid and insufficiently related to a percentage-based test. Consequently, what remains is the more particularized interest in guaranteeing that the fundraiser's fee be "reasonable" in the sense that it not be fraudulent. The interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored regulation. The question, then, is whether the added flexibility of this regulation is sufficient to tailor the law to this remaining interest. We conclude that it is not.

Despite our clear holding in *Munson* that there is no nexus between the percentage of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent, the State defines, prima facie, an "unreasonable" and "excessive" fee according to the percentage of total revenues collected. Indeed, the State's test is even more attenuated than the one held invalid in *Munson*, which at least excluded costs and expenses of solicitation from the fee definition. 467 U. S., at 950, n. 2. Permitting rebuttal cannot supply the missing nexus between the percentages and the State's interest.[7]

But this statute suffers from a more fundamental flaw. Even if we agreed that some form of a percentage-based measure could be used, in part, to test for fraud, we could not agree to a measure that requires the speaker to prove "reasonableness" case by case based upon what is at best a loose inference that the fee might be too high. Under the Act, once a prima facie showing of unreasonableness is made, the fundraiser must rebut the showing. Proof that the solicitation involved the advocacy or dissemination of information is not alone sufficient; it is merely a factor that is added to the calculus submitted to the factfinder, who may still decide that the costs incurred or the fundraiser's profit were excessive. Similarly, the Act is impermissibly insensitive to the realities faced by small or unpopular charities, which must often pay more than 35% of the gross receipts collected to the fundraiser due to the difficulty of attracting donors. See *Munson*, 467 U. S., at 967. Again, the burden is placed on the fundraiser in such cases to rebut the presumption of unreasonableness.

According to the State, we need not worry over this burden, as standards for determining "[r]easonable fundraising fees will be judicially defined over the years." Reply Brief for Appellants 6. Speakers, however, cannot be made to

---

[7] Even if percentages are not completely irrelevant to the question of fraud, their relationship to the question is at best tenuous, as *Schaumburg* and *Munson* demonstrate.

wait for "years" before being able to speak with a measure of security.  In the interim, fundraisers will be faced with the knowledge that every campaign incurring fees in excess of 35%, and many campaigns with fees between 20% and 35%, will subject them to potential litigation over the "reasonableness" of the fee.  And, of course, in every such case the fundraiser must bear the costs of litigation and the risk of a mistaken adverse finding by the factfinder, even if the fundraiser and the charity believe that the fee was in fact fair.  This scheme must necessarily chill speech in direct contravention of the First Amendment's dictates.  See *Munson*, *supra*, at 969; *New York Times Co. v. Sullivan*, 376 U. S. 254, 279 (1964).`

This chill and uncertainty might well drive professional fundraisers out of North Carolina, or at least encourage them to cease engaging in certain types of fundraising (such as solicitations combined with the advocacy and dissemination of information) or representing certain charities (primarily small or unpopular ones), all of which will ultimately "reduc[e] the quantity of expression." · *Buckley* v. *Valeo*, 424 U. S. 1, 19, 39 (1976).  Whether one views this as a restriction of the charities' ability to speak, *Munson*, *supra*, at 967, and n. 16, or a restriction of the professional fundraisers' ability to speak, *Munson*, *supra*, at 955, n. 6, the restriction is undoubtedly one on speech, and cannot be countenanced here.

-------------

·`The dissent is correct that the statute requires that expenses incurred in the dissemination of information be considered legitimate by the factfinder.  But that does not address the primary defect here: that fraud is presumed by a surrogate and imprecise formula.  Nor does it suffice to argue, as does the dissent, that the statute is valid because the fundraiser, not the charity, is the object of the regulation.  Fining the fundraiser based upon its speech for the charity has an obvious and direct relation to the charity's speech.  See *Munson*, 467 U. S., at 967, and n. 16.  Moreover, the fundraiser has an independent First Amendment interest in the speech, even though payment is received.  See, *e. g., New York Times Co. v. Sullivan*, 376 U. S., at 265–266.

In striking down this portion of the Act, we do not suggest that States must sit idly by and allow their citizens to be defrauded. North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it. Further North Carolina may constitutionally require fundraisers to disclose certain financial information to the State, as it has since 1981. *Munson, supra,* at 967, n. 16. If this is not the most efficient means of preventing fraud, we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency. *Schaumburg,* 444 U. S., at 639; *Schneider* v. *State,* 308 U. S. 147, 164 (1939).

## III

We turn next to the requirement that professional fundraisers disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity. Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech. See *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, 256 (1974) (statute compelling newspaper to print an editorial reply "exacts a penalty on the basis of the content of a newspaper").

The State argues that even if charitable solicitations generally are fully protected, this portion of the Act regulates only commercial speech because it relates only to the professional fundraiser's profit from the solicited contribution. Therefore, the State asks us to apply our more deferential commercial speech principles here. See generally *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976).

It is not clear that a professional's speech is necessarily commercial whenever it relates to that person's financial motivation for speaking. Cf. *Bigelow* v. *Virginia,* 421 U. S.

809, 826 (1975) (state labels cannot be dispositive of degree of First Amendment protection).   But even assuming, without deciding, that such speech in the abstract is indeed merely "commercial," we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech.   Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon.   This is the teaching of *Schaumburg* and *Munson*, in which we refused to separate the component parts of charitable solicitations from the fully protected whole.   Regulation of a solicitation "must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech . . . , and for the reality that without solicitation the flow of such information and advocacy would likely cease."   *Schaumburg, supra*, at 632, quoted in *Munson*, 467 U. S., at 959–960.   See also *Meyer* v. *Grant,* 486 U. S. 414, 422, n. 5 (1988); *Thomas* v. *Collins*, 323 U. S., at 540–541.   Thus, where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase.   Such an endeavor would be both artificial and impractical.   Therefore, we apply our test for fully protected expression."

North Carolina asserts that, even so, the First Amendment interest in compelled speech is different than the interest in compelled silence; the State accordingly asks that we apply a deferential test to this part of the Act.   There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment

---

"Of course, the dissent's analogy to the securities field entirely misses the point.   Purely commercial speech is more susceptible to compelled disclosure requirements.   See *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*. 471 U. S. 626 (1985).

guarantees "freedom of speech," a term necessarily comprising the decision of both what to say and what *not* to say.

The constitutional equivalence of compelled speech and compelled silence in the context of fully protected expression was established in *Miami Herald Publishing Co.* v. *Tornillo, supra.* There, the Court considered a Florida statute requiring newspapers to give equal reply space to those they editorially criticize. We unanimously held the law unconstitutional as content regulation of the press, expressly noting the identity between the Florida law and a direct prohibition of speech. "The Florida statute operates as a command in the same sense as a statute or regulation forbidding appellant to publish a specified matter. Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." *Id.*, at 256. That rule did not rely on the fact that Florida restrained the press, and has been applied to cases involving expression generally. For example, in *Wooley* v. *Maynard*, 430 U. S. 705, 714 (1977), we held that a person could not be compelled to display the slogan "Live Free or Die." In reaching our conclusion, we relied on the principle that "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind,'" as illustrated in *Tornillo.* 430 U. S., at 714 (quoting *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 637 (1943)). See also *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of California*, 475 U. S. 1, 9–11 (1986) (plurality opinion of Powell, J.) (characterizing *Tornillo* in terms of freedom of speech); *Harper & Row Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539, 559 (1985); *Abood* v. *Detroit Board of Education,* 431 U. S. 209, 234–235 (1977); *West Virginia Board of Education* v. *Barnette, supra.*

These cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of "fact": either form of com-

pulsion burdens protected speech. Thus, we would not immunize a law requiring a speaker favoring a particular government project to state at the outset of every address the average cost overruns in similar projects, or a law requiring a speaker favoring an incumbent candidate to state during every solicitation that candidate's recent travel budget. Although the foregoing factual information might be relevant to the listener, and, in the latter case, could encourage or discourage the listener from making a political donation, a law compelling its disclosure would clearly and substantially burden the protected speech.

We believe, therefore, that North Carolina's content-based regulation is subject to exacting First Amendment scrutiny. The State asserts as its interest the importance of informing donors how the money they contribute is spent in order to dispel the alleged misperception that the money they give to professional fundraisers goes in greater-than-actual proportion to benefit charity. To achieve this goal, the State has adopted a prophylactic rule of compelled speech, applicable to all professional solicitations. We conclude that this interest is not as weighty as the State asserts, and that the means chosen to accomplish it are unduly burdensome and not narrowly tailored.

Although we do not wish to denigrate the State's interest in full disclosure, the danger the State posits is not as great as might initially appear. First, the State presumes that the charity derives no benefit from funds collected but not turned over to it. Yet this is not necessarily so. For example, as we have already discussed in greater detail, where the solicitation is combined with the advocacy and dissemination of information, the charity reaps a substantial benefit from the act of solicitation itself. See *Munson, supra,* at 963; *Schaumburg,* 444 U. S., at 635. Thus, a significant portion of the fundraiser's "fee" may well go toward achieving the charity's objectives even though it is not remitted to the

charity in cash.[10]    Second, an unchallenged portion of the disclosure law requires professional fundraisers to disclose their professional status to potential donors, thereby giving notice that at least a portion of the money contributed will be retained.[11]    Donors are also undoubtedly aware that solicitations incur costs, to which part of their donation might apply. And, of course, a donor is free to inquire how much of the contribution will be turned over to the charity.    Under another North Carolina statute, also unchallenged, fundraisers must disclose this information upon request.    N. C. Gen. Stat. § 131C–16 (1986).    Even were that not so, if the solicitor refuses to give the requested information, the potential donor may (and probably would) refuse to donate.

Moreover, the compelled disclosure will almost certainly hamper the legitimate efforts of professional fundraisers to raise money for the charities they represent.    First, this provision necessarily discriminates against small or unpopular charities, which must usually rely on professional fundraisers.    Campaigns with high costs and expenses carried out by professional fundraisers must make unfavorable disclosures, with the predictable result that such solicitations will prove unsuccessful.    Yet the identical solicitation with its high costs and expenses, if carried out by the employees of a charity or volunteers, results in no compelled disclosure, and therefore greater success.    Second, in the context of a

---

[10] In addition, the net "fee" itself benefits the charity in the same way that an attorney's fee benefits the charity, or the purchase of any other professional service benefits the charity.    That the fundraiser's fee does not first pass through the charity's hands is of small import.

[11] The Act, as written, requires the fundraiser to disclose his or her employer's name and address.    Arguably, this may not clearly convey to the donor that the solicitor is employed by a for-profit organization, for example, where the employer's name is "Charitable Fundraisers of America." However, nothing in this opinion should be taken to suggest that the State may not require a fundraiser to disclose unambiguously his or her professional status.    On the contrary, such a narrowly tailored requirement would withstand First Amendment scrutiny.

verbal solicitation, if the potential donor is unhappy with the disclosed percentage, the fundraiser will not likely be given a chance to explain the figure; the disclosure will be the last words spoken as the donor closes the door or hangs up the phone.[12]  Again, the predictable result is that professional fundraisers will be encouraged to quit the State or refrain from engaging in solicitations that result in an unfavorable disclosure.

In contrast to the prophylactic, imprecise, and unduly burdensome rule the State has adopted to reduce its alleged donor misperception, more benign and narrowly tailored options are available.  For example, as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file.  This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation.  Alternatively, the State may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements.  These more narrowly tailored rules are in keeping with the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored.

---

[12] The figure chosen by the State for disclosure is curious.  First, it concerns unrelated past solicitations without regard for whether they are similar to the solicitation occurring at the time of disclosure.  Thus, the high percentage of retained fees for past dinner-dance fundraisers must be disclosed to potential contributors during a less expensive door-to-door solicitation.  Second, the figure does not separate out the costs and expenses of prior solicitations, such as printing, even though these expenses must also be borne by charities not subject to the disclosure requirement (*i. e.*, those engaging in employee or volunteer staffed campaigns).  The use of the "gross" percentage is even more curious in light of the fact that most contracts between the solicitor and the charity provide for a fee based on the percentage of "net" funds collected (*i. e.*, the gross funds collected less costs), making this more relevant figure far easier to come by.  Brief for Appellants 15.

*E. g., Consolidated Edison Co.* v. *Public Service Comm'n of New York,* 447 U. S. 530, 537–538 (1980). "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP* v. *Button,* 371 U. S. 415, 438 (1963) (citations omitted).

## IV

Finally, we address the licensing requirement. This provision requires professional fundraisers to await a determination regarding their license application before engaging in solicitation, while volunteer fundraisers, or those employed by the charity, may solicit immediately upon submitting an application.

Given our previous discussion and precedent, it will not do simply to ignore the First Amendment interest of professional fundraisers in speaking. It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak. *E. g., New York Times Co.* v. *Sullivan,* 376 U. S., at 265–266. And the State's asserted power to license professional fundraisers carries with it (unless properly constrained) the power directly and substantially to affect the speech they utter. Consequently, the statute is subject to First Amendment scrutiny. See *Lakewood* v. *Plain Dealer Publishing Co.,* 486 U. S. 750, 755–756 (1988) (when a State enacts a statute requiring periodic licensing of speakers, at least when the law is directly aimed at speech, it is subject to First Amendment scrutiny to ensure that the licensor's discretion is suitably confined).[13]

---

[13] Even were we to focus only on the charities' First Amendment interest here, we still could not adopt the dissent's reasoning, for its logic in that regard necessarily depends on the premise that professional fundraisers are interchangeable from the charities' vantage. There is no reason to believe that is so. Fundraisers may become associated with particular clients or causes. Regulating these fundraisers with the heavy hand that unbridled discretion allows affects the speech of the clients or causes with

Generally, speakers need not obtain a license to speak. However, that rule is not absolute. For example, States may impose valid time, place, or manner restrictions. See *Cox* v. *New Hampshire*, 312 U. S. 569 (1941). North Carolina seeks to come within the exception by alleging a heightened interest in regulating those who solicit money. Even assuming that the State's interest does justify requiring fundraisers to obtain a license before soliciting, such a regulation must provide that the licensor "will, within a specified brief period, either issue a license or go to court." *Freedman* v. *Maryland*, 380 U. S. 51, 59 (1965). That requirement is not met here, for the Charitable Solicitations Act (as amended) permits a delay without limit. The statute on its face does not purport to require when a determination must be made, nor is there an administrative regulation or interpretation doing so. The State argues, though, that its history of issuing licenses quickly constitutes a practice effectively constraining the licensor's discretion. See *Poulos* v. *New Hampshire*, 345 U. S. 395 (1953). We cannot agree. The history to which the State refers relates to the period before the 1985 amendments, at which time professional fundraisers were permitted to solicit as soon as their applications were filed. Then, delay permitted the speaker's speech; now, delay compels the speaker's silence. Under these circumstances, the licensing provision cannot stand.[11]

---

which they are associated. Nor are we persuaded by the dissent's assertion that this statute merely licenses a profession, and therefore is subject only to rationality review. Although Justice Jackson did express his view that solicitors could be licensed, a proposition not before us, he never intimated that the licensure was devoid of all First Amendment implication. *Thomas* v. *Collins*, 323 U. S. 516, 544–545 (1945) (Jackson, J.. concurring).

[11] In addition, appellees assert that the Secretary of State has unbridled discretion to grant or deny a license, and that the differential treatment of professional and nonprofessional fundraisers denies them equal protection of the laws. In light of our conclusion that the licensing provision is unconstitutional on other grounds, we do not reach these questions.

## V

We hold that the North Carolina Charitable Solicitations Act is unconstitutional in the three respects before us. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, concurring in part and concurring in judgment.

We have held the solicitation of money by charities to be fully protected as the dissemination of ideas. See *ante*, at 787–789; *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 959–961 (1984); *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 628–632 (1980). It is axiomatic that, although fraudulent misrepresentation of facts can be regulated, cf. *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), the dissemination of ideas cannot be regulated to prevent it from being unfair or unreasonable, see, *e. g.*, *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 51, 54, 57 (1988); *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 256–258 (1974); *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 419 (1971); *Kingsley International Pictures Corp.* v. *Regents of University of New York*, 360 U. S. 684, 688–689 (1959); *Baumgartner* v. *United States*, 322 U. S. 665, 673–674 (1944). Because the opinion of the Court, except for footnote 11, is consistent with this principle, I join all of the opinion with that exception.

As to the last two sentences of that footnote, which depart from the case at hand to make a pronouncement upon a situation that is not before us, I do not see how requiring the professional solicitor to disclose his professional status is narrowly tailored to prevent fraud. Where core First Amendment speech is at issue, the State can assess liability for specific instances of deliberate deception, but it cannot impose a prophylactic rule requiring disclosure even where misleading statements are not made. Cf. *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 843–844 (1978).

Since donors are assuredly aware that a portion of their donations may go to solicitation costs and other administrative expenses—whether the solicitor is a professional, an in-house employee, or even a volunteer—it is not misleading in the great mass of cases for a professional solicitor to request donations "for" a specific charity without announcing his professional status. Compensatory employment is, I would judge, the natural order of things, and one would expect *volunteer* solicitors to announce that status as a selling point.

The dictum in footnote 11 represents a departure from our traditional understanding, embodied in the First Amendment, that where the dissemination of ideas is concerned, it is safer to assume that the people are smart enough to get the information they need than to assume that the government is wise or impartial enough to make the judgment for them.

JUSTICE STEVENS, concurring in part and dissenting in part.

Although I join Parts I, II, and III of the Court's opinion, I agree with THE CHIEF JUSTICE that the licensing provisions in the North Carolina statute do not impose a significant burden on the charities' ability to speak and that there is no evidence suggesting that the State will be dilatory in the processing of license applications. Thus, I respectfully dissent from Part IV of the Court's opinion.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, dissenting.

I

In 1980 this Court held invalid an ordinance enacted by a suburb of Chicago regulating the percentage of the gross amount of money raised by charitable solicitors which might be used for the cost of conducting the solicitation. *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620. In an effort to comply with that decision, Maryland enacted a statute forbidding charities to contract with professional fundraisers in such a way as would allow the fundraisers to

retain more than 25% of the money collected. Even though an administrative official was empowered to waive this requirement when its imposition would effectively prevent the charitable organization from raising money, the Court nonetheless invalidated the statute. *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947 (1984). Following the decision in *Munson*, North Carolina revised its Charitable Solicitations Act to contain the provisions described in the opinion of the Court today. The Court now invalidates the North Carolina provisions as well.

The Court's opinion in *Schaumburg* relied on the seminal cases of *Lovell* v. *Griffin*, 303 U. S. 444 (1938), *Schneider* v. *State*, 308 U. S. 147 (1939), and *Martin* v. *Struthers*, 319 U. S. 141 (1943), as establishing the right of charitable solicitors under the First Amendment to be free from burdensome governmental regulation. It is interesting to compare the activities of the three "solicitors" in those cases with the activities of professional fundraisers in cases like the present one. In *Lovell*, for example, appellant was convicted for distributing a religious pamphlet and a magazine called the "Golden Age" without a permit. 303 U. S., at 450. In *Schneider*, the evidence showed that one of the petitioners was a "Jehovah's Witness" who canvassed house-to-house seeking to leave behind some literature and to obtain contributions to defray the cost of printing additional literature for others. 308 U. S., at 158. In *Martin*, the appellant was also a Jehovah's Witness, who went door-to-door distributing to residents of homes leaflets advertising a religious meeting. 319 U. S., at 142.

These activities are a far cry indeed from the activities of professional solicitors such as those involved in *Munson* and the present case. In *Munson*, the plaintiff, an Indiana corporation, was "a professional for-profit fundraiser in the business of promoting fundraising events and giving advice to customers on how those events should be conducted. Its Maryland customers include[d] various chapters of the Fra-

ternal Order of Police." 467 U. S., at 950. The professional fundraisers in the present case presumably operate in the same manner. Yet the Court obdurately refuses to allow the various States which have legislated in this area to distinguish between the sort of incidental fundraising involved in *Lovell*, *Schneider*, and *Martin* on the one hand, and the entirely commercial activities of people whose job is, simply put, figuring out how to raise money for charities.

The Court has recognized that the commercial aspects of newsgathering and publishing are different from the editorial function, and has upheld regulation of the former against claims based on the First Amendment. A newsgathering organization is subject to the provisions of the National Labor Relations Act, *Associated Press* v. *NLRB*, 301 U. S. 103 (1937); a newspaper is subject to the antitrust laws, *Indiana Farmer's Guide Publishing Co.* v. *Prairie Farmer Publishing Co.*, 293 U. S. 268 (1934), as well as the provisions of the Fair Labor Standards Act, *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962). It seems to me that the vaguely defined activity of "charitable solicitation," when pursued by professional fundraisers such as are involved in this case, deserves no more favorable treatment.

## II

But even accepting that *Schaumburg* and *Munson* were rightly decided, I cannot join in the extension of their principles to the North Carolina statute involved here. This Act provides, at its heart, only that no professional fundraiser may charge a charity "an excessive and unreasonable fundraising fee." N. C. Gen. Stat. § 131C–17.2(a) (1986). Unlike the statute at issue in *Schaumburg*, which directly prevented charities from soliciting donations unless they could show that 75% of the proceeds were used for charitable purposes, 444 U. S., at 624, the fee provisions of this Act put no direct burden on the charities themselves. And, unlike the Maryland statute in *Munson*, the fee provisions are designed

to allow the professional fundraiser whose fees are challenged to introduce evidence that the fees were in fact reasonable under the circumstances. In my view, the distinctions between the statute in this case and those in *Munson* and *Schaumburg* are crucial to the proper First Amendment analysis of the Act, for they make this Act both less burdensome on the protected speech activities of charitable organizations and more carefully tailored to the interests that the State is trying to serve by regulating fundraising fees.

First, as to the nature of the burden on protected speech: The Court today concludes flatly that "this regulation burdens speech, and must be considered accordingly." *Ante*, at 790. As far as I know, this Court has never held that an economic regulation with some impact on protected speech, no matter how small or indirect, must be subjected to strict scrutiny under the First Amendment. The only burden on speech identified in the Court's opinion is that professional fundraisers may be "chill[ed]" by the risk that if they charge more than 20% of the gross they may be required to show that the fee they charged was reasonable. The Court speculates that this "chill" will "drive professional fundraisers out of North Carolina" or induce them to cease certain types of fundraising. *Ante*, at 794. Of course, it is undeniable that a price control regulation—which is what these fee provisions are, in essence—will have some impact on the supply of the services whose prices are being regulated. See *Munson*, *supra*, at 979 (REHNQUIST, J., dissenting). But to say that professional fundraisers will be driven from the State is the rankest speculation; they may be a far doughtier breed than the Court realizes. I am unwilling to say, on this extremely bare record, that a statute prohibiting a professional fundraiser from charging fees that are "unreasonable and excessive" will have the sort of impact on the availability of fundraising services that the Court hypothesizes. The plaintiffs in this case had an opportunity to put in evidence in the District Court to this effect, but did not do so; we should not

substitute our guesswork as to the economic consequences of the regulation for a conclusion that ought to be deduced from evidence.

I believe that on this record the minimal burden on speech resulting from the statute can be characterized as remote or incidental, and that therefore there is no reason to apply "heightened scrutiny" to the regulation of fees charged by the professional fundraisers. The fee provisions of the Act are rationally related to the State's legitimate interests in preventing fraud on potential donors and protecting against overcharging of charities by professional fundraisers.

Even if heightened scrutiny should apply, the fee provisions in the North Carolina statute in my view still survive. This Court has never indicated that the State's interest in preventing fraud would not be sufficient to support a narrowly tailored regulation of fees. See *Schaumburg*, 444 U. S., at 636–637; *Munson*, 467 U. S., at 961. Here, the State asserts the additional interest of "promot[ing] the efficient transmission of the public's money to the charity through the medium of the for-profit, professional fundraiser," Reply Brief for Appellants 3, or as I put it in *Munson*, protecting the "expectations of the donor who thinks that his money will be used to benefit the charitable purpose in the name of which the money was solicited," 467 U. S., at 980, n. 2.[1]

---

[1] I find it hard to understand the Court's complaint that the statute's attempts to encourage charity and charitable contributions and to maximize the funds that flow to charities are based on "the paternalistic premise that charities' speech must be regulated for their own benefit," *ante*, at 790. All economic regulation of this sort is "paternalistic" in the sense that it prevents parties who wish to contract with one another from entering into a contract on precisely the terms that they would choose. But ever since *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379 (1937), finally overruled *Lochner* v. *New York*, 198 U. S. 45 (1905), and *Adkins* v. *Children's Hospital*, 261 U. S. 525 (1923), "paternalism" has been a perfectly acceptable motive for legislative regulation of this sort. *Olsen* v. *Nebraska ex rel. Western Reference & Bond Assn., Inc.*, 313 U. S. 236, 246 (1941).

In determining whether the North Carolina statute narrowly serves these interests, it is important to note that the statute does not impose a blanket prohibition upon fees that exceed a certain proportion of gross receipts, as did the statute in *Munson*.[2] The basic judgment for the trier-of-fact under the fee provisions is whether the fee is "reasonable." This determination is made not only in light of the percentages, but also in light of such factors as whether the solicitation "involve[s] the dissemination of information, discussion, or advocacy relating to public issues as directed by the [charity] which is to benefit from the solicitation," §§ 131C–17.2(c), (d)(1), and whether the ability of the charity to "raise money or communicate its ideas, opinions, and positions to the public would be significantly diminished" by the charging of a lower fee, § 131C–17.2(d)(2).

The inclusion of these factors in the "reasonableness" determination of the factfinder protects against the vices of the fixed-percentage scheme struck down in *Munson*. The limited waiver of the 25% limitation in *Munson* was found unacceptable because the statute gave the State "no discretion to determine that reasons other than financial necessity warrant a waiver." 467 U. S., at 963. This meant that organizations whose high solicitation costs were a result of the dissemination of information would not be able to obtain waivers and would thus be prevented by the 25% limitation from hiring professional fundraisers. *Id.*, at 963–964. No such problem exists here: the statute mandates that First Amendment considerations such as the desire to disseminate information and the ability of the charity to get its message across be taken into account by the factfinder in determining

---

[2] Neither *Schaumburg* nor *Munson* holds that the "percentage of gross receipts" figure is *irrelevant* to the question whether a particular fee is unreasonable or fraudulent. See *Munson*, 467 U. S., at 961, 966, and n. 14. The problem with the figure was that, standing alone, it was "simply too imprecise an instrument to accomplish" the end of preventing fraud. *Id.*, at 961.

reasonableness. Thus, unlike the statute in *Munson*, it cannot be said that the reasonableness limitation is overbroad, as the North Carolina statute is designed and carefully tailored to avoid any restrictions on "First Amendment activity that results in high costs but is itself a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves to be unpopular," *Munson, supra,* at 967. In my view, the fee provisions of the statute thus satisfy the constitutional requirement that it be narrowly tailored to serve the State's compelling interests. I would reverse the judgment of the Court of Appeals on this issue.

## III

The next part of the statute to be considered is the requirement of the Act that the fundraiser disclose to the potential donor "the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity," *ante,* at 795.[*] The asserted purpose of this provision is to "better inform the donating public as to where its money will go" in order to assist the potential donor in making the decision whether to donate. Brief for Appellants 17. The Court concludes, after a lengthy discussion of the constitutionality of "compelled statements," that strict scrutiny

---

[*] In the words of the statute, the fundraiser must disclose

"[t]he average of the percentage of gross receipts actually paid to [charities] by the professional fund-raising counsel or professional solicitor conducting the solicitation for all charitable sales promotions conducted in this State by that [fundraiser] for the past 12 months, or for all completed charitable sales promotions where the [fundraiser] has been soliciting funds for less than 12 months." N. C. Gen. Stat. § 131C–16.1(3) (1986).

The statute also contains several other disclosure provisions that are not at issue in this appeal, including a requirement that the professional fundraiser disclose his name, his employer, and his employer's address to potential donors, §§ 131C–16.1(1)–(2), and a requirement that any person subject to licensure under the Act disclose upon request "his percentage of fund-raising expenses and the purpose of the organization," N. C. Gen. Stat. § 131C–16 (1986).

should be applied and that the statute does not survive that scrutiny.   I disagree.

. This statute requires only that the professional solicitor disclose certain relevant and verifiable facts to the potential donor.   Although the disclosure must occur at some point in the context of the solicitation (which can be either oral or written), it is directly analogous to mandatory disclosure requirements that exist in other contexts, such as securities transactions.   In my view, the required disclosure of true facts in the course of what is at least in part a "commercial" transaction—the solicitation of money by a professional fundraiser—does not necessarily create such a burden on core protected speech as to require that strict scrutiny be applied. Indeed, it seems to me that even in cases where the solicitation involves dissemination of a "message" by the charity (through the fundraiser), the disclosure required by the statute at issue here will have little, if any, effect on the message itself, though it may have an effect on the potential donor's desire to contribute financially to the cause.

. Of course, the percentage of previous collections turned over to charities is only a very rough surrogate for the percentage of collections which will be turned over by the fundraiser in the particular drive in question.   The State's position would be stronger if either in the legislative history or in the testimony in the District Court there was some showing that the percentage charged by any particular fundraiser does not vary greatly from one drive to another. Nonetheless, because the statute is aimed at the commercial aspect of the solicitation, and because the State's interests in enacting the disclosure requirements are sufficiently strong, I cannot conclude that the First Amendment prevents the State from imposing the type of disclosure requirement involved here, at least in the absence of a showing that the effect of the disclosure is is to dramatically limit contributions or impede a charity's ability to disseminate ideas or information.   But, again, we have nothing but speculation to guide

us here, since neither party offered any evidence as to how this provision would operate when the statute went into effect. On this state of the record, and considering the rule that "[w]hen a statute is assailed as unconstitutional we are bound to assume the existence of any state of facts which would sustain the statute in whole or in part," *Alabama Federation of Labor* v. *McAdory*, 325 U. S. 450, 465 (1945), I would uphold this provision.

## IV

The final issue raised here is the validity of the licensing provisions contained in the North Carolina statute. It is beyond dispute that the statute differentiates between professional fundraisers and volunteer or in-house fundraisers; the former may not engage in solicitation until their license application is accepted, while the latter may. But this fact alone does not impose an impermissible burden on protected speech, nor does it require that the licensing provisions be subjected to strict scrutiny.

For one thing, the requirement that a professional fundraiser apply for and receive a license before being allowed to solicit donations does not put any burden on the *charities'* ability to speak. Even if the charity is one that typically relies on professional fundraisers, the effect of the statute is to require only that the fundraiser the charity hires is a fundraiser who has been licensed by the State. While this effect may limit to some degree the charity's ability to hire whomever it chooses as its professional fundraiser, it will still be able to choose from other, licensed professionals and obtain their assistance in soliciting donations.[4] To the extent,

---

[4] There is absolutely no basis in the record to conclude that the licensing and registration requirements of the Act are so onerous that they would drive professional fundraisers out of the State to such an extent that there would be none left for a charity to hire. If there were such evidence, then I would certainly agree that the licensing provisions did have the effect of restricting speech by charities, at least for those charities who rely heavily on professional fundraising.

then, that the licensing provisions have a burden on speech, it is one that truly can be said to be incidental.[5] In addition, it is a burden that is countenanced in other circumstances without any suggestion that some type of heightened scrutiny should apply. For example, bar admission requirements may have some incidental effect on First Amendment protected activity by restricting a petitioner's right to hire whomever he pleases to serve as his attorney, but we have never suggested that state regulation of admission to the bar should generally be subject to strict scrutiny. In my view, then, requiring a professional fundraiser to wait until its license is approved before engaging in solicitation does not create a sufficiently significant burden on speech by charities that it should be reviewed under any more exacting standard than that which is typically applied to state occupational licensing requirements.

Nor do I think that heightened scrutiny should apply because the statute allegedly has some effect on speech by the professional fundraisers themselves. It simply is not true that in this case the fundraisers are prevented from engaging in any protected speech on their own behalf by the State's licensing requirements; the requirements only restrict their ability to engage in the profession of "solicitation" without a license. We do not view bar admission requirements as invalid because they restrict a prospective lawyer's "right" to be hired as an advocate by a client. So in this case we should not subject to strict scrutiny the State's attempt to license a business — professional fundraising — some of whose members might reasonably be thought to pose a risk of fraudulent activity. As Justice Jackson put it:

---

[5] Indeed, the record also indicates that even if the charity decides to wait until the licensing proceedings are complete in order to hire a specific fundraiser, the charity will not have long to wait. See App. 58–62. The speed with which licensing proceedings have been handled by the State in the past belies appellees' claim that the waiting period for professional fundraisers has a chilling effect on the charities' right to speak.

"The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system." *Thomas* v. *Collins*, 323 U. S. 516, 545 (1945) (concurring opinion).

In this case, the North Carolina statute's requirement that professional solicitors wait for a license before engaging in any solicitation is rationally related to the State's interest in protecting the public and the charities themselves. The State could reasonably have concluded that professional solicitors pose a greater risk of fraud, see, *e. g.*, App. 60, making it more important that the State have an opportunity to review their license applications before they are allowed to engage in solicitation. Presumably, there is less of a risk that a charity will be defrauded or cheated by volunteer fundraisers and fundraisers who are themselves employed by the charity, as these individuals are more likely to be known to the charity. See *New Orleans* v. *Dukes*, 427 U. S. 297 (1976). I would, accordingly, uphold the licensing provisions of the statute notwithstanding its different treatment of volunteers and professionals.