Dear Mr. Fanning:
By telephone conference on August 1, 2003, you requested clarification of certain parts of Attorney General Opinion No. 03-0207. This office has extensively researched the jurisprudence of this State as well as other states and we have not found any case law pertaining to advertisements on publicly owned internet web sites. Nor have we found any Louisiana statutes pertaining to the creation of web sites for public entities, including school boards, in exchange for the sharing of advertising revenues.
The only Louisiana statute we found that pertains to public schools and the internet is R.S. 17:100.7, which mandates the establishment of policies regarding access by students and employees to ". . . Internet and online sites that contain or make reference to harmful material the character of which is such that it is reasonably believed to be obscene, child pornography, conducive to the creation of a hostile or dangerous school environment, pervasively vulgar, excessively violent, or sexually harassing in the school environment all as defined by any applicable state or federal laws and the policies adopted pursuant to this Subsection. Such policies shall include but not be limited to prohibitions against accessing sites containing information on the manufacturing or production of bombs or other incendiary devices."[1]
Attorney General Opinion No. 03-0207 stated that the School Board's web site is an incorporeal movable and that the School Board may therefore dispose of it in accordance with law. It then stated that the only possible authorization for the sale or lease of a school board owned web page was found in R.S. 17:87.6, which authorizes public school boards to sell, lease, or otherwise dispose of, at public or private sale, for cash or on terms of credit, any personal property which is not used and, in the judgment of the school board, is not needed in the operation of any school or schools within its jurisdiction.
However, as we now understand the terms of the Ed Web proposal, it does not appear that it would involve a lease or disposition of the School Board's web site. Any advertising would be on the "frontpages," which are owned by Ed Web. In any event, it is not clear that space on the School Board's web pages devoted to advertising procured under the Ed Web contract is a lease or disposition of that space within the context of R.S. 17:87.6, which appears to be directed at surplus property not needed by the School Board. The web site is not surplus property that the School Board no longer needs. Nor is it clear that incorporeal property such as the web site is the type of personal property intended by this statute.
The question then becomes whether there is other authority for the School Board to enter into this contract. We believe that Ed Web is proposing to enter into a service contract with the School Board. Under the proposal, Ed Web will provide services to the School Board, including assisting in maintaining and upgrading, as necessary, the School Board's web site and procuring the advertising. The fees from the advertising will be divided between Ed Web and the School Board. Those advertising revenues paid to Ed Web will be their only compensation under the contract. The School Board does not have to pay Ed Web for their services.
R.S. 17:81 sets forth the general powers of school boards. As noted above, no statute addresses the issue of publicly owned web sites or contracts involving advertising for such web sites. There is therefore no explicit authority for the School Board to enter into such contracts. However, many prior cases and Attorney General Opinions have recognized that, in addition to the express powers granted by the legislature in R.S. 17:81, a school board possesses additional implied powers, which are necessary to implement its policies and fulfill its duties. SeeLouisiana Association of General Contractors v. Calcasieu PSB,586 So.2d 1354 (La. 1991); Louisiana Teacher's Assoc. v. Orleans PSB,303 So.2d 564 (La.App. 4th Cir. 1974); Disposal Systems, Inc. v.Calcasieu PSB, 243 So.2d 915 (La.App. 3rd Cir. 1971); Shaw v. Caddo PSB,347 So.2d 39, (La.App. 2d Cir. 1977). See also Attorney General Opinion Nos. 75-804; 78-538; 79-441; 79-561; 80-302; 81-1213; 82-158; 84-478; 85-476; 86-273; 87-297; 89-589; 93-224; 93-456; 94-509; 00-291(A), all of which address implied powers of school boards in various contexts.
As noted above, R.S. 17:100.7 mandates that school boards establish policies regarding access by students and employees to the internet and online sites. Pursuant to R.S. 100.7(B), such policies ". . . shall include the use of computer-related technology or the use of internet service provider technology designed to block access or exposure to any harmful material. . ." This statute recognizes the fact that the use of the internet in schools is a valuable tool for research and instruction. To gain access to the internet and to the technology referenced in the statute to help carry out the required internet policy, school boards must contract for different types of internet services. The power to contract for these services is properly implied by the general authority of a school board to carry out its statutory duties under R.S. 17:81 and R.S. 17:100.7. We believe that the Ed Web contract at issue is similar to other contracts for internet services, and therefore the School Board is authorized to enter into the contract.
The fact that the School Board will receive a portion of the advertising revenues makes that portion of the proposed contract similar to other arrangements that schools make as part of their fundraising activities. This office has recognized in Attorney General Opinion Nos. 89-589 and 93-456 that individual schools may legally engage in activities designed to raise funds for the schools and that the school boards have the power to set up their own guidelines for fundraising activities.
You requested clarification of our previous opinion as to the discussion of "academic purposes." In Attorney General Opinion No. 93-694, this office considered whether the Ascension Parish School Board could contract for radio broadcasts in one of the parish schools, which broadcasts would air during the lunch hour, class breaks, and pre and post class times. This office ultimately determined that there was no authorization for such a contract. In the discussion, this office reviewed jurisprudence and previous Attorney General Opinions which indicated that parish school boards are without authority to use or utilize any property dedicated to school purposes for any other purpose than that of public education. The opinion found that the jurisprudence seemed to indicate that public authorities can make such casual and incidental use of a building as long as it is not inconsistent with the main purpose for which it was erected.
In the Ascension Parish School Board situation, as in the present case, the purpose of the proposed contract was to obtain additional revenue for the school board. However, there are differences between the facts in Attorney General Opinion No. 93-694 and the present case. First, the purpose of the advertising is to generate revenue not only to pay the School Board, but also to pay for the web site services being provided by Ed Web under its proposed contract. It is the method being used to compensate the contractor for its services, without having to use School Board funds to do so. Second, the web site services being provided relate to the web pages for the School Board and the various schools in the school district, so they are clearly educational in nature. We do not believe that the method being used to pay for the services, the advertising, changes the educational nature of the web pages. To do so would call into question the authority of many of the fundraising activities undertaken by school boards and individual schools, including yearbook and athletic program advertisements, corporate logos on scoreboards and other fundraising activities with corporate involvement, which, as noted above, are clearly permissible. We therefore believe that access by students to the School Board's web pages at school would be permitted, as long as such access is in accordance with the School Board's internet use policy.
Attorney General Opinion No. 03-0207 also raised certain First Amendment concerns. Solicitation is a recognized form of speech protected by the First Amendment. See Schaumburg v, Citizens for a BetterEnvironment, 444 U.S. 620, 629, 100 S.Ct. 826, 832, 63 L.Ed.2d 73
(1980); Riley v. National Federation of Blind of N.C., Inc., 487 U.S. 781,788-789, 108 S.Ct. 2667, 2673-2674, 101 L.Ed.2d 669 (1988); U.S. v.Kokinda, 497 U.S. 720, 110 S.Ct. . 3115. The Supreme Court has adopted a forum analysis as a means of determining when a public body's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the public body can control access depends on the nature of the relevant forum. Cornelius v. NAACP LegalDefense Educational Fund, Inc., 473 U.S. 788, 800,105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985).
In Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37,103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court announced a tripartite framework for determining how First Amendment interests are to be analyzed with respect to Government property. Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny. Regulation of speech on property that the Government has expressly dedicated to speech activity is also examined under strict scrutiny. But regulation of speech activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness. U.S. v. Kokinda, supra.
The right to use government property for private expression depends on whether the property, by law or tradition, has been given the status of a public or nonpublic forum or has been designated for specific official use. The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. See Cornelius v. NAACP LegalDefense and Educational Fund, Inc., 473 U.S. 788,105 S.Ct. 3439,87 L.Ed.2d 567 (1985). In Cornelius, the Court identified three types of fora: traditional public, designated public, and nonpublic. In a traditional public forum, such as streets and parks, speakers may be excluded only when necessary to serve a compelling state interest and the exclusion is narrowly tailored. See Cornelius, supra, 473 U.S. at 800,105 S.Ct. at 3448, 87 L.Ed.2d at 578. In a designated public forum, where the government has "intentionally designated a place or means of communication" for limited, public discourse, speakers cannot be excluded without a compelling governmental interest. Ibid. Where the forum is nonpublic, however, the government may restrict speech as long as the restrictions are reasonable and not "an effort to suppress expression merely because public officials oppose the speaker's view." Ibid.
The question then becomes whether the School Board's internet web pages are a public or a nonpublic forum. Since the Cornelius case, there have been other cases addressing these issues in the context of school property. In Hazelwood School District v. Kuhlmeier 484 U.S. 260,108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the United States Supreme Court held that a student newspaper is a nonpublic forum. In Planned Parenthood ofSouthern Nevada, Inc. v. Clark County School District, 941 F.2d 817 (9th Cir. 1991), the court found that high school newspapers, yearbooks and athletic programs were each a nonpublic forum. In Diloreto v. DowneyUnified School District Board of Education, 196 Fd.3d 958 (9th Cir. 1999), the court found that the baseball field fence upon which advertisements were placed was a nonpublic forum.
In each of these cases, there was no intent found on the part of the school systems to create a public forum, despite the fact that in each case advertisements were solicited from the general public. In each case, the schools had policies and procedures that governed what sort of advertisements would be acceptable. In the Hazelwood case, the court stated that educators have the right to control expressive activity that "students, parents and other members of the public might reasonably perceive to bear the imprimatur of the school." See Hazelwood,484 U.S. at 271, 108 S.Ct. at 570.
In Diloreto, the court stated that "government policies and practices that historically have allowed commercial advertising, but have excluded political and religious expression, indicate an intent not to designate a public forum for all expressive activity, but to reserve it for commercial speech." See Diloreto, 196 F.3d at 958.
Therefore, it appears that the School Board's web pages would be a nonpublic forum, and subject to reasonable regulation by the School Board, as long as the School Board does not intend the web pages to be a public forum. We note that the Ed Web proposal contains restrictions on certain types of advertising that can be sold and gives the School Board the right to veto any advertisement. Based on our review of the cases cited above, it would appear that the School Board would not, by virtue of entering into the proposed Ed Web contract, be found to have intended to create a public forum. Commercial advertising on the web sites regulated by the School Board as to content would not convert what was a nonpublic forum into a public forum.
The School Board could therefore place reasonable regulations on the types of advertising that would be permitted, as it has done, as long as the regulations are content based and not based on a particular viewpoint. Regulations that would prohibit persons from expressing a certain viewpoint on a particular topic would be improper, even though the web pages are a nonpublic forum. To avoid this, and to avoid the web pages from being thought of as a public forum in the first place, the School Board should allow only commercial advertisements for products and services on the web pages and should refrain from opening the web pages to expressions of public opinion.
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 By: ____________________________ ROBERT E. HARROUN, III Assistant Attorney General
[1] But see, R.S. 17:100.7(C) providing that this Section "shall not prohibit any authorized employee or student of a public elementary or secondary school from having unfiltered or unrestricted access to the Internet or an online service for legitimate scientific or educational purposes as determined and approved by the employing governing authority."