Robert MacDONALD, Plaintiff,

v.

Howard SAFIR, in his official capacity as New York City Police Commissioner, Defendant.

No. 98 Civ. 2332 LBS.

United States District Court,
S.D. New York.

Nov. 16, 1998.

As Amended Nov. 19, 1998.

Richard L. Wilson, for plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York, for defendant, by Virginia Waters.

### OPINION

SAND, District Judge.

Plaintiff, Robert MacDonald, both individually and in his capacity as a member of the Million Marijuana March Organization ("Marijuana March"), filed suit in this Court under 42 U.S.C. § 1983 asserting a facial challenge to the constitutionality of § 10–110 of the New York City Administrative Code (the "Ordinance"), the principal parade-permitting law in New York City (the "City").[1] The suit arises from Plaintiff's filing of a parade permit application on January 21, 1998, requesting that the New York City Police Department ("Police Department") al-

---

1. The full text of the Ordinance may be found as an Appendix to this Opinion.

low the 1998 Marijuana March to proceed up Fifth Avenue, from Washington Square Park to Central Park at Ninety–Sixth Street, on May 2, 1998. The City denied Plaintiff's request but offered Plaintiff an alternative route for use on the same date.[2]

On April 1, 1998, Plaintiff filed a Verified Complaint and brought an Order to Show Cause for a Preliminary Injunction before this Court seeking to enjoin Defendant, the New York City Police Commissioner, from enforcing § 10–110 as it pertained to the proposed May 2 parade. Plaintiff claimed that the Ordinance constitutes an unlawful prior restraint on speech in contravention of the First Amendment and he sought (1) a declaration that the Ordinance is unconstitutional and (2) a permanent injunction preventing its enforcement. Plaintiff argued that the Ordinance vests unfettered discretion in the Police Commissioner, places content-based restrictions on speech, and fails to contain procedural safeguards that are constitutionally required.

Defendant moved to dismiss the Verified Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. At a hearing on April 14, 1998, the Court denied Plaintiff's request for injunctive relief. By Opinion dated June 16, 1998, the Court granted Defendant's Motion in part and dismissed two of Plaintiff's three claims after finding that the Ordinance does not vest excessive discretion in the hands of the Police Commissioner and is a content neutral regulation. *See MacDonald v. Safir*, 98 Civ. 2332(LBS), 1998 WL 318690, at *3–4 (S.D.N.Y. June 16, 1998). The Court reserved decision on the question of whether the absence of explicit limits in § 10–110 on the time by which the Police Department must respond to parade permit applications renders the Ordinance facially unconstitutional. *See id.* at *5. The Court requested supplemental briefing from the parties on the

Police Department's historical implementation and administration of the Ordinance, *see id.* (citing *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)), converted Defendant's Motion to Dismiss into a Motion for Summary Judgment, and heard oral argument for a second time on November 4, 1998.

For the reasons set forth below, we conclude that the absence of temporal safeguards in § 10–110 renders the Ordinance unconstitutional. Accordingly, we deny Defendant's Motion for summary judgment and grant summary judgment to Plaintiff on that claim.

## Legal Standard

The Court may grant summary judgment only where the moving papers and affidavits submitted by the parties show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.Pro. 56(c); *see also Brown v. City of Oneonta*, 106 F.3d 1125, 1130 (2d Cir.1997). In ruling on a motion for summary judgment, a court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is a "drastic procedural weapon because 'its prophylactic function, when exercised, cuts off a party's right to present his case to the jury.'" *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988) (quoting *Donnelly v. Guion*, 467 F.2d 290, 291 (2d Cir.1972)).

The Court may grant summary judgment in favor of the non-moving party even though it has made no formal cross-motion if the following criteria are satisfied: (1) no genuine issue of material fact is in dispute; (2)

---

2. The underlying facts that precipitated the filing of the present suit are set forth in greater detail by the Court's previous Opinion in this case. *See MacDonald v. Safir*, 98 Civ. 2332(LBS), 1998 WL 318690, at *1–2 (S.D.N.Y. June 16, 1998). Although the parties contest certain factual issues regarding Plaintiff's permit application, for pur-

poses of a facial challenge these disputes are of no consequence. Our analysis is limited to the constitutionality of the law as written and as historically applied by the City and is not impacted by the City's application of the Ordinance in this case.

the non-moving party is entitled to judgment as a matter of law; and (3) the moving party has had an adequate opportunity to come forward with all of its evidence. *See* 10A Charles Alan Wright *et al.*, Federal Practice and Procedure § 2720 (3d ed.1998). In assessing the third requirement, the Second Circuit has explained that the risk of "procedural prejudice" is low when the court grants summary judgment to the non-moving party on an issue raised and fully briefed by the moving party. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991). In addition, the Second Circuit has stated that summary judgment is appropriate where the non-moving party "impliedly cross-move[s]" for summary judgment and the moving party is "on notice that the ... [particular legal] issue was before the district judge." *Project Release v. Prevost*, 722 F.2d 960, 964 n. 7, 969 (2d Cir.1983). The standard has been satisfied in this case because Defendant moved for summary judgment on the issue of the Ordinance's facial constitutionality, Plaintiff has impliedly cross-moved for summary judgment on that same issue, (*see* Pl's Opp. at 15), the Court has given both parties ample opportunity to submit all relevant evidence, *see MacDonald v. Safir*, 98 Civ. 2332(LBS), 1998 WL 318690, at *5 (S.D.N.Y. June 16, 1998), and Defendant indicated at oral argument that the Police Department had no further evidence to submit bearing on § 10–110's constitutionality. (*See* Tr. Oral Arg. Nov. 4, 1998, at 2–3.)

## Discussion

### A. *Introduction*

Section 10–110 requires that individuals seeking to conduct a parade, procession, or race in New York City submit a written application to the Police Department at least thirty-six hours prior to the start of the event. The Police Commissioner is directed to grant permit requests "after due investigation," and the grounds on which a permit may be denied are set forth in the Ordinance. Both parties to the present dispute agree that the text of the Ordinance does not contain an express time limit by which the Commissioner must grant or deny an application. (*See* Def's Mem. at 3; Pl's Opp. at 5; *see also* Cirillo Dep. at 9; Centamore Dep. at 33.)[3]

The legal question before the Court is whether the absence from § 10–110 of an explicit time-frame by which the City must respond to a parade permit application renders the Ordinance unconstitutional on its face.[4] A line of Supreme Court cases establishes the principle that a heavy presumption of unconstitutionality attends any prior restraint on speech and can be overcome only by showing that the statutory scheme at issue contains particular procedural safeguards. We examine this line of cases to determine whether § 10–110 meets the criteria set forth in the Supreme Court's extensive First Amendment jurisprudence.

### B. *The* Freedman *Line*

In *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the Supreme Court held unconstitutional a Maryland criminal statute that required movie theater owners to submit films to the State Board of Censors prior to public display so that the Board could determine whether the films were obscene or tended to incite criminal activity. *See id.* at 52 & n. 2, 58, 85 S.Ct. 734. The Court noted that the statute "effectively bars exhibition of any disapproved film, unless and until the exhibitor undertakes a time-consuming appeal to the Mary-

---

**3.** We use "§ 10–110" throughout to refer collectively to the Ordinance and New York City Police Department Administrative Guide Procedure No. 321–14, which accompanies it. The latter provision states that the Police Department should "[c]ause investigation to be made" regarding each permit application but fails to provide any additional specificity regarding Police Department time limits for permit application processing.

**4.** The Second Circuit has never ruled on the facial constitutionality of § 10–110. *See Irish*

*Lesbian, Gay Organization v. Giuliani*, 143 F.3d 638, 647 (2d Cir.1998) (applying *res judicata* to prevent a litigant from challenging § 10–110's facial constitutionality but finding the Ordinance not otherwise "insulate[d] from judicial review" and stating that "[a] reviewing court that agrees that section 10–110 is constitutionally infirm may easily distinguish" *Irish Lesbian and Gay Organization v. Bratton*, 882 F.Supp. 315 (S.D.N.Y.), *aff'd* 52 F.3d 311 (2d Cir.1995), which did not address § 10–110's compliance with the procedural safeguards we discuss below).

land courts and succeeds in having the Board's decision reversed," and imposes "no time limit ... for completion of Board action." *Id.* at 54–55, 85 S.Ct. 734. The Court further observed:

> Because the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression. And if it is made unduly onerous, by reason of delay or otherwise, to seek judicial review, the censor's determination may in practice be final.

*Id.* at 57–58, 85 S.Ct. 734 (footnote omitted). On the absence of statutory time limits to insure the Board's prompt consideration of films, the Court concluded that "[r]isk of delay is built into the Maryland procedure." *Id.* at 55, 85 S.Ct. 734.

The Court struck down the statute and stated that a system such as Maryland's could be upheld only if it contained three "procedural safeguards designed to obviate the dangers of a censorship system." *Id.* at 58, 85 S.Ct. 734. The system must (1) insure that any restraint prior to judicial review lasts for only a brief, specified duration; (2) offer the opportunity for expeditious judicial review; and (3) place the burden of seeking judicial review on the censor rather than on the individual and force the censor to bear the burden of proof at trial. *See id.* at 58–59, 85 S.Ct. 734; *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). The Court concluded that Maryland's statute was deficient as to each of these requirements. *See Freedman,* 380 U.S. at 60, 85 S.Ct. 734.

The Court again considered the procedural safeguard issue in *Riley v. National Federation of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), which struck down a North Carolina statute regulating professional fund-raisers' ability to solicit charitable contributions. *See id.* at 784, 108 S.Ct. 2667. The relevant provision required that professional fund-raisers, but not others, obtain licenses prior to soliciting contributions. *See id.* at 801, 108 S.Ct. 2667. The Court found the statute invalid under *Freedman* due to the absence of a brief, definite time limit in which applications would be processed:

> [T]he Charitable Solicitations Act ... permits a delay without limit. The statute on its face does not purport to require when a determination must be made, nor is there an administrative regulation or interpretation doing so. The State argues, though, that its history of issuing licenses quickly constitutes a practice effectively constraining the licensor's discretion. We cannot agree. The history to which the State refers relates to ... [a previous version of the statute that allowed fundraisers] to solicit as soon as their applications were filed. Then, delay permitted the speaker's speech; now, delay compels the speaker's silence.

*Id.* at 802, 108 S.Ct. 2667 (citation omitted). The Court struck down the requirement as violative of the First Amendment.

The Court's most recent pronouncement on the *Freedman* procedural requirements came in *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), in which the Court struck down a Dallas City Ordinance ("Dallas Ordinance") regulating sexually oriented businesses on the ground that the ordinance lacked adequate procedural protections. *See id.* at 220–23, 110 S.Ct. 596. The petitioners, adult entertainment proprietors, brought a facial challenge against the ordinance claiming that it was unconstitutional due to the absence of any brief, definite time limits in which the licensing board was required to act on license applications. Although the Dallas Ordinance struck down in *FW/PBS* is distinguishable from New York City's § 10–110—the Dallas Ordinance was "more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses," *id.* at 225, 110 S.Ct. 596, whereas we have already held § 10–110 to be content neutral, *see MacDonald v. Safir,* 98 Civ. 2332(LBS), 1998 WL 318690, at *4 (S.D.N.Y. June 16, 1998)—the Supreme Court's thorough exposition of *Freedman*'s application in the licensing context has great bearing to resolution of the present case.

First, the Supreme Court noted that the petitioners' use of a facial challenge to attack

the Dallas Ordinance was appropriate: "[W]here a scheme creates a 'risk of delay,' [*Freedman,*] 380 U.S. at 55, 85 S.Ct. 734, such that 'every application of the statute create[s] an impermissible risk of suppression of ideas,' we have permitted parties to bring facial challenges." *FW/PBS,* 493 U.S. at 223–24, 110 S.Ct. 596 (citation omitted) (final alteration in original) (quoting *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 798 n. 15, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). Second, the Court noted the heavy presumption of unconstitutionality regarding any system, such as Dallas's, that places a prior restraint on expression. *See id.* at 225, 110 S.Ct. 596 (citing cases). Third, the Court explained the rationale behind *Freedman* by stating that a system of licensing not cabined with sufficient procedural safeguards can devolve into a regime of censorship: "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *See id.* at 227, 110 S.Ct. 596.

The Dallas Ordinance required that the Chief of Police approve a license application within thirty days of its receipt, but further provided that a license should "not issue if the 'premises to be used for the sexually oriented business have not been approved by the health department, fire department, and the building official as being in compliance with applicable laws and ordinances.'" *Id.* (quoting Dallas Ordinance § 41A–5(a)(6)). The ordinance did not set a time limit for completion of those inspections and provided no mechanism whereby the license applicant could guarantee that the City would complete the process swiftly. *See id.* The Court accordingly struck down the Dallas Ordinance as "allow[ing] indefinite postponement of the issuance of a license" in violation of *Freedman. Id.*[5]

The Fourth and Eleventh Circuits have recently considered licensing statutes under *Freedman* and *FW/PBS.* In *Redner v. Dean,* 29 F.3d 1495 (11th Cir.1994), the Eleventh Circuit held unconstitutional a Citrus County, Florida, ordinance ("Citrus County Ordinance") regulating adult entertainment establishments. *See id.* at 1497. The Citrus County Ordinance mandated that operators of adult entertainment establishments obtain a license from the County Administrator prior to opening such businesses. The Administrator was required to grant or deny the license within forty-five days and if no action had been taken by that time, the provision stated that the applicant "may be permitted to begin operating the establishment for which a license is sought, unless and until the County Administrator notifies the applicant of a denial of the application and states the reason(s) for the denial." *See id.* (quoting Citrus County Ordinance § 2–5(a)(1)). Upon denial of a permit request, an applicant had fifteen days to appeal to the Citrus County Board of County Commissioners, and the ordinance provided that the board's clerk "shall schedule a hearing for as soon as the Board's calendar will allow." *Id.* at 1498 (quoting Citrus County Ordinance § 6–1(2)).

In striking down the law, the court found that the forty-five day limit imposed on the Administrator was illusory because no action was in fact required within that time. *See id.* at 1500. If the Administrator failed to approve or deny a license, the County was not required to allow the applicant to open the business but rather retained discretion regarding whether or not to do so. The court found that the plain language of the Citrus County Ordinance "risks the suppression of protected expression for an indefinite time period prior to any action on the part of the decisionmaker or any judicial determination." *Id.* at 1501. Moreover, the court noted that in the event that the Administrator denied an application, the Citrus County Ordinance placed no limit on how quickly the Board of

---

5. The Court also found that the Dallas Ordinance violated *Freedman*'s second requirement by failing to provide prompt judicial review of adverse license determinations. *See id.* at 229. The Court went on to find the third *Freedman* requirement—that the city bear the burden of seek-ing judicial review—inapplicable to the facts of the case. *See id.* at 228–29. We have previously dismissed Plaintiff's claims with regard to the second and third *Freedman* safeguards. *See MacDonald v. Safir,* 98 Civ. 2332(LBS), 1998 WL 318690, at *4 (S.D.N.Y. June 16, 1998).

County Commissioners needed to hear the appeal. *See id.* The court accordingly found the statute lacking under *Freedman* and *FW/PBS.*

In *11126 Baltimore Boulevard, Inc. v. Prince George's County, Maryland,* 58 F.3d 988 (4th Cir.1995) (*en banc*), the Fourth Circuit struck down a Prince George's County adult bookstore ordinance as an invalid prior restraint that failed to satisfy *Freedman.* The ordinance prohibited adult bookstore owners from operating in Prince George's County without special zoning exceptions that could be obtained from the County District Council. The ordinance required the council to render its decision on a permit exception within 150 days or the permit was presumed denied. *See id.* at 992. The court first found that the zoning scheme constituted a prior restraint, *see id.* at 995–96, and then concluded that the 150–day time limit was excessively long and thus invalid under *Freedman, see id.* at 997–98.

We also find instructive a 1997 decision from within this District striking down an ordinance from the Village of Pelham Manor ("Pelham Manor Ordinance") in New York for failure to comply with the *Freedman* procedural requirements. *See Nichols v. Village of Pelham Manor,* 974 F.Supp. 243, 252 (S.D.N.Y.1997). The Pelham Manor Ordinance required that all individuals who planned to engage in door-to-door solicitations first obtain a license from the Chief of Police, *see id.* at 249 n. 5, but the ordinance failed to specify any time period for the Chief's consideration of applications, *see id.* at 250. In addition to finding that the statute could be deemed unconstitutional for vesting too much discretion in the hands of the Chief of Police, the court explained that the ordinance failed to satisfy's *Freedman*'s requirements: "Consistent with the ordinance, the Chief simply could neglect to act on an application for an indefinite period. Such a delay effectively could silence a solicitor like [the plaintiff] ..., whose effort to qualify candidates for an election was time-sensitive." *Id.* at 252. The court thus struck down the provision.

### C. *The Present Dispute*

#### 1. Threshold Issues

The parties disagree as to whether the Ordinance is presumptively constitutional or unconstitutional and, accordingly, who bears the burden of proof at this stage of the litigation. The crucial question is whether we should subject § 10–110 to a *Freedman* prior restraint analysis or limit our review to a time, place, and manner inquiry.

Plaintiff contends that § 10–110 constitutes a prior restraint on speech. There is substantial support for this contention in the relevant case law. *See Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("[R]equiring a permit and a fee before authorizing public speaking, parades, or assemblies in the archetype of a traditional public forum is a prior restraint on speech...." (citation omitted) (internal quotation marks omitted) (quoting *Frisby v. Schultz,* 487 U.S. 474, 480, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988))); *Ward v. Rock Against Racism,* 491 U.S. 781, 795 n. 5, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("[T]he regulations we have found invalid as prior restraints have 'had this in common: ' they gave public officials the power to deny use of a forum in advance of actual expression.'" (quoting *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975))); *11126 Baltimore Boulevard, Inc.,* 58 F.3d at 995 ("[T]he Court has made clear that otherwise valid content-neutral time, place, and manner restrictions that require governmental permission prior to engaging in protected speech must be analyzed as prior restraints and are unconstitutional if they do not ... provide for the *Freedman* procedural safeguards."); *see also Baby Tam & Co., Inc. v. Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998); *Stokes v. Madison,* 930 F.2d 1163, 1168–69 (7th Cir.1991); John Calvin Jeffries, *Rethinking Prior Restraint,* 92 Yale L.J. 409, 410, 417–18, 421–26 (1983) (disfavoring use of the term "prior restraint" as being ill-defined but placing licensing schemes squarely within the normal definition).

Defendant appears to argue that we should not subject § 10–110 to a *Freedman* prior restraint analysis because the Ordinance is a

content neutral time, place, and manner regulation. (*See* Def's Mem. at 14; Tr. Oral Arg. Nov 4, 1998, at 11.) Defendant therefore maintains that § 10–110 is presumptively constitutional and that Plaintiff has a heavy burden in attempting to mount a facial challenge to the provision. (*See* Def's Mem. at 10.) Defendant's claim that Plaintiff bears the burden in this litigation depends entirely on the assumption that we will treat § 10–110 as a content neutral time, place, and manner regulation, for it is beyond dispute that prior restraints bear a heavy presumption of unconstitutionality. *See, e.g., New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

■ Content neutral limitations on speech in public fora may be upheld as valid time, place, and manner restrictions if they are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication. *See Ward, v. Rock Against Racism,* 491 U.S. 781, 791, 798–99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The Supreme Court has long used the time, place, and manner framework to evaluate parade permit regulations and similar statutory schemes. *See, e.g., Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293–95, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Graff v. Chicago,* 9 F.3d 1309, 1334 (7th Cir.1993) (*en banc*) (Ripple, J., concurring). The Court has found, however, that the time, place, and manner analysis is inappropriate when considering a system that vests "arbitrary discretion ... in some governmental authority," because excessive discretion may serve to vitiate any apparent content neutrality. *See Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *see also Cox v. Louisiana,* 379 U.S. 536, 556–58, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *United States v. Kistner,* 68 F.3d 218, 221 (8th Cir.1995).

■ We are ultimately persuaded that we should review § 10–110 under a *Freedman* prior restraint analysis rather than simply scrutinizing the Ordinance as a time, place, and manner restriction. First, we note that in *FW/PBS,* Justice White pointedly argued that the Court's time, place, and manner analysis should govern review of Dallas's licensing scheme. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 244–47, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (White, J., concurring in part and dissenting in part). The majority rejected this approach, however, treating Dallas's licensing and inspection scheme as a prior restraint and employing a *Freedman* analysis. *See FW/PBS,* 493 U.S. at 225, 110 S.Ct. 596; *see also 11126 Baltimore Boulevard, Inc. v. Prince George's County, Maryland,* 58 F.3d 988, 996 (4th Cir.1995) (*en banc*) ("[T]he *FW/PBS* Court necessarily rejected the position advanced by Justice White....").

Second, the time, place, and manner analysis appears uniquely ill-suited to resolving cases where the source of the alleged constitutional infirmity is the absence of adequate procedural safeguards. The Supreme Court has consistently applied a prior restraint analysis when a statute vests unbridled discretion in an administrative official, *see, e.g., Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (striking down city statute that vested total discretion in mayor regarding whether to grant permits allowing newspaper vending machines on public property); *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Staub v. Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958), and the dangers associated with the absence of clear and brief time limits are similar to those in the boundless discretion cases. *See FW/PBS,* 493 U.S. at 223–24, 110 S.Ct. 596; *Graff v. Chicago,* 9 F.3d 1309, 1332 n. 5 (7th Cir.1993) (*en banc*) (Flaum, J., concurring in judgment). We believe it would be inappropriate to use a time, place, and manner analysis when the absence of procedural safeguards in a licensing scheme may serve to cloak content bias.

Third, we find this result to be consistent with additional case law indicating that a court should invoke the time, place, and manner analysis only after concluding that the

statute in question adequately contains *Freedman* safeguards. *See Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *see also Graff,* 9 F.3d at 1333–35 (Ripple, J., concurring) (accepting plurality decision to review Chicago newsstand licensing ordinance as time, place, and manner regulation only after concluding that the ordinance contained sufficient safeguards to limit officials' discretion); *Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth.,* 984 F.2d 1319, 1327 (1st Cir.1993) (reviewing transit authority regulation that required individuals to obtain preauthorization before engaging in noncommercial expressive activity in the Boston subway system under time, place, and manner framework only after concluding that *Freedman* safeguards were present).

We recognize that characterization of a statute as a "prior restraint" or a "time, place, and manner regulation" may be more a statement of the conclusion reached as to its validity than an analytical device to determine such validity. The crucial question is not the terminology invoked but a determination whether the statutory scheme permits the regulating authority to exercise broad discretion in a manner that permits content based discrimination. Because § 10–110 vests such discretion in the hands of Police Department officials, the weight of authority indicates that we should analyze the Ordinance as a prior restraint and subject it to a *Freedman* analysis. Section 10–110 thus bears a presumption of unconstitutionality, but one that Defendant can overcome by showing that the Ordinance contains the *Freedman* procedural safeguards. *See Jews for Jesus,* 984 F.2d at 1327; *Stokes v. Madison,* 930 F.2d 1163, 1169 (7th Cir.1991); *Community for Creative Non–Violence v. Turner,* 893 F.2d 1387, 1390 (D.C.Cir.1990).

A plain reading of the text of § 10–110 finds that the Ordinance places no explicit time limits on the Police Department's consideration of license applications. Defendant concedes as much in papers submitted to this Court. (*See* Def's Mem. at 3.) Yet the Ordinance's failure to contain an express time limit is not necessarily fatal to Defendant's case, as the Supreme Court has counseled that we must also consider the City's past practice regarding implementation and interpretation of § 10–110. *See Forsyth County,* 505 U.S. at 131, 112 S.Ct. 2395; *Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 770 & n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). At the Court's request, the parties have submitted additional evidence regarding the City's application of the Ordinance. It is to this evidence that we now turn.

### 2. Evidence of City Practice in Implementing § 10–110

Defendant argues that the absence of clear time limits in § 10–110 is corrected by the City's consistent practice of giving permit applicants notice regarding their applications several weeks prior to the event date:

> All applicants whose applications had been processed as of July 15, 1998 were informed of the decision on their application *an average of 5–6 weeks* before the event. Lt. Cirillo who processed the majority of the City's parade permit applications for 8 years said he normally informed applicants a month or two before the event.

(*Id.* at 12–13 (emphasis added); *see also id.* at 6 ("On the average, during this time period applicants were informed of Police Department action on their permit applications 38 days before the proposed parade date."); Def's Reply at 3 (stating that applicants are "generally informed" of Police Department decisions "on the average" of five to six weeks "prior to the event").) Defendant does not offer additional elaboration on use of the word "average," and the Court finds averages to be of limited significance in this case. Excessive delay in processing certain applications does not become constitutionally permissible by the prompt consideration of others, despite the fact that the average notification time across all cases may appear unobjectionable. (*See* Tr. Oral Arg. Nov. 4, 1998, at 5.)

We note that extrinsic evidence of past City practice is allowed in order to supple-

ment the text of a statute with terms which, had they been included, would have cured the constitutional defect. As the Supreme Court has explained, "the limits the city claims are implicit in its law [must] be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood,* 486 U.S. at 770, 108 S.Ct. 2138. Because the City could not write a statute requiring the Police Department to respond to parade applicants in a particular amount of time "on average," it is plainly insufficient to use implementation evidence to achieve that same result.

Ultimately, the aggregate information offered by the City is useful to our inquiry but more relevant is the permit-by-permit breakdown that allows us to see both when applications were filed and when the City issued a formal response. (*See* Oct. 5, 1998, Centamore Aff.Ex. A.) We focus on a handful of these applications in particular:

(1) The Federation of Hellenic Societies of Greater New York applied for a permit on August 6, 1997. The permit for the event, which took place on March 29, 1998, was not formally approved until March 17, 1998, and no permit letter was sent out until March 23, 1998. (*See id.*)

(2) The United States Veterans applied for a permit on February 20, 1998. The permit for the event, which took place on May 25, 1998, was not formally approved until May 18, 1998, and no permit letter was sent out until May 19, 1998. (*See id.*)

(3) The New York Road Runner's Club applied for a permit on December 19, 1997. The permit for the event, which took place on June 6, 1998, was not formally approved until June 2, 1998, and no permit letter was sent out until June 4, 1998. (*See id.*)

(4) The Philippine Independence Day Committee applied for a permit on January 5, 1998. The permit for the event, which took place on June 7, 1998, was not formally approved until May 22, 1998, and no permit letter was sent out until that date. (*See id.*)

(5) The United War Veterans of Kings County applied for a permit on February 19, 1998. The permit for the event, which took place on May 25, 1998, was not formally approved until May 18, 1998, and no permit letter was sent out until May 19, 1998. (*See* Def's Reply at n. 2.)

In each of the above cases, the City deferred final action on an application for a period of months and failed to issue a formal decision until days before the event. Although Defendant argues that "an applicant's speech is not denied during the time the Police Department reviews and processes its parade permit application, since the parade (where the message will be conveyed) is weeks away," (Def's Mem. at 17), we believe the governing law indicates that delay can easily lead to the suppression of speech in certain circumstances. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 228, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

We are particularly troubled by Defendant's handling of two permit applications for parades to protest against police brutality. According to evidence provided by Defendant, the Coalition Against Police Brutality ("Coalition") applied for a permit on March 12, 1998, for an event to take place on March 31, 1998. The Police Department did not formally approve the permit until March 30, 1998—the day before the event—and no permit letter was sent out until that date. The available evidence before the Court regarding 1998 permit applications reveals that there were eleven instances in which the Police Department notified applicants within three days of the event date.[6] Of those eleven instances, the Coalition experienced the longest delay from the date of filing to the date of notification.

An examination of the twenty-two permit applications filed within a month of the requested event date is particularly relevant to our analysis here, because it is useful to compare the speed with which the Police Department processes similarly time-sensi-

---

**6.** Applications of International Action Center, Coalition Against Police Brutality, New York City Central Labor Council (two separate permit requests), CODEM, Mary's Fashion Hats, 1199, Million Marijuana March, 178 Avenue S, Evangelical Children's Association Incorporated, and Tottenville Local Development Corporation.

tive applications.[7] The evidence shows that eight of the twenty-two applicants were given ten or more days of notice prior to the event,[8] and seven of the applicants were notified at least three days prior to the event.[9] Thus, it appears that the City often accommodates time constraints and manages to process permit applications on short notice while still giving parade planners adequate time to make necessary arrangements. Of the seven remaining intra-month applicants, four filed their permit applications within four days of the event,[10] thus precluding anything less than last-minute approval or denial. One filed the application eleven days before the event,[11] another ten days in advance.[12] The record contains no explanation for why the Police Department's consistent ability to process applications expeditiously and in advance of event dates failed when considering the Coalition's application, which was filed twenty days prior to the event.[13]

The second troubling instance of extensive delay prior to the issuance of a parade permit to a group protesting police brutality arises from a recently decided case within this District. (*See October 22nd Coalition v. Safir*, 98 Civ. 7333(JSM), Tr. Oral Arg. October 21, 1998.) *October 22nd Coalition* involved a permit application filed on September 13, 1998, for an event on October 22, 1998. The applicants did not hear any response from the Police Department until October 14, just eight days prior to the event.

(*See id.* at 3.) The court found that the one month-long delay was "unconscionable," (*id.* at 37), created a "strong inference" of content-based regulation, (*id.* at 3), and prejudiced the plaintiffs, (*see id.* at 35): "It's strange with the police, that this group that charges it with brutality takes 30 days to respond to their ... application, which will make it impossible for these people now with short notice to organize their demonstration through other routes." (*Id.* at 6–7.) Accordingly, the Court granted the plaintiff's request for a preliminary injunction. (*See id.* at 37.) The Court of Appeals denied the City's application for a stay.

Defendant disparages the significance of *October 22 Coalition*, urging that as the lone instance in which a court has overturned a City permit decision on the ground of delayed processing, the decision is insufficient to support a determination that § 10–110 is unconstitutional on its face. (*See* Tr. Oral Arg. Nov. 4, 1998, at 5, 19.) We agree with Defendant insofar as he argues that a single instance of excessive delay should not cause a court to strike down an otherwise legitimate statute—i.e. one that contains the appropriate procedural safeguards—as being facially unconstitutional under *Freedman*. We do not believe, however, that § 10–110 is "otherwise legitimate."

Section 10–110 does not contain any explicit limits on the time by which the Police

---

**7.** We treat all applications filed within 31 days of the event date to be "intra-month."

**8.** Applications of Irish Lesbian & Gay Organization, Vishnu Mandir, Bay Ridge St. Patrick's Parade Incorporated, Heritage of Pride, Council for Sabbath Observance, Queens Lesbian & Gay Pride Committee, Long Island Assembly 4th Degree, and Goodwill Games Incorporated.

**9.** Applications of New York City Central Labor Council, Mary's Fashion Hats, Million Marijuana March, 178 Avenue S, Stuyvesant Division Brooklyn Sunday School Union, Evangelical Children's Association Incorporated, and New York Road Runners Club.

**10.** Applications of International Action Center, CODEM, 1199, and Tottenville Local Development Corporation.

**11.** Application of New York City Central Labor Council.

**12.** Application of Regina Pacis Church. We construe the stated "3/!6/98" date of filing to mean "3/16/98" rather than "3/6/98." Under our reading, but not the alternative one, Regina Pacis Church is an intra-month applicant.

**13.** There is an additional way to view the delay information regarding the 22 intra-month permit applicants that, although marginally useful, shows the danger in relying too heavily on aggregate information. When averaged together, the typical intra-month applicant requested a permit roughly 13 days prior to the planned event and received notification roughly six days later, or seven days before the event date. This average, which appears to present a reasonable time-line for Police Department responses, obscures the fact that the Coalition applied for its permit 20 days prior to the event but was not notified of its permit status until the last possible day. It is this "outlier" point, rather than the average case, that generates constitutional concern.

Department must respond to parade permit applications, and Defendant has asked that we look to evidence of implementation to fill the gaps left by the text of the Ordinance. The decision in *October 22 Coalition* is one relevant piece of implementation evidence, and it strongly indicates that the Police Department has not cured the absence of textual guidelines by crafting binding internal regulations. Thus, we do not hold § 10–110 unconstitutional based on the result in *October 22 Coalition*, we strike down the Ordinance because it fails to contain the temporal safeguards required by *Freedman.* That *October 22 Coalition* bolsters this conclusion should not be taken to mean that, standing alone, it would have been sufficient to support a finding of facial unconstitutionality of an otherwise valid ordinance.[14]

The above evidence fails to establish that the Police Department has consistently interpreted the statute to respond to permit applications "within a specified brief period," *Freedman v. Maryland*, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and the facts surrounding the police brutality protests raise the very concerns *Freedman* aimed to solve: delay as a form of speech suppression, *see FW/PBS*, 493 U.S. at 228, 110 S.Ct. 596; *see also Nichols v. Village of Pelham Manor*, 974 F.Supp. 243, 252 (S.D.N.Y.1997). In response to this concern, Defendant states that eighty-five to ninety percent of the City's large parades are "scheduled annually and the applicant as well as the City know that the event will happen on a certain day." (Def's Mem. at 12; *see also* October 5, 1998, Centamore Aff. at ¶ 5; October 5, 1998, Cirillo Aff. at ¶ 8.) We find this argument unpersuasive.

First, Defendant has failed to submit any evidence obtained from organizers of large, annual events indicating that these individuals know well in advance that their permit applications will be granted. There is, however, evidence in the record to the contrary. Both the Marijuana March and the October 22 Coalition Parade are large, recurring annual events. (*See* October 5, 1998, Cirillo Aff. at ¶ 9; *October 22nd Coalition v. Safir*, 98 Civ. 7333(JSM), Tr. Oral Arg. October 21, 1998, at 4.) In both cases, event organizers were unsure regarding the status of their applications and filed suit in federal court precisely because they did not "know" that their events would receive permits for the requested dates. Second, accepting *arguendo* Defendant's claim for the remainder of our analysis, we find Defendant's assertion to be of little significance in determining whether the City has satisfied *Freedman*'s requirement of brief and specified time limits. *Freedman*'s procedural safeguards attempt to insure content neutrality and the City may not avoid those requirements simply because a number of permit applicants, those who plan large annual events, have no objection to the lack of binding regulations.

Third, we note that Defendant's argument says little about the degree to which organizers of small or non-recurring events have their expression muffled by the City's occa-

---

**14.** In a letter to Chambers dated November 10, 1998, Defendant again argues that "the unconstitutional application of a statute in one instance does not facially invalidate the entire statute." (Virginia Waters Letter, Nov. 10, 1998, at 1.) Defendant then states:

> The following cases made it clear that the unconstitutional application of a statute in one instance does not facially invalidate the entire statute. A facial challenge to a statute can succeed "only when the statute is substantially overbroad, *i.e.*, when the statute is unconstitutional in a substantial portion of the cases to which it applies." *Regan v. Time, Inc.*, [468 U.S. 641, 650, 104 S.Ct. 3262, 82 L.Ed.2d 487] ... (1984). *Accord New York v. Ferber*, 458 U.S. 747, 749, 102 S.Ct. 3348, 73 L.Ed.2d 1113 ... (1982); *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 ... (1973).

(Virginia Waters Letter, Nov. 10, 1998, at 1–2.) This standard, which applies to facial challenges brought *on overbreadth grounds, see Regan*, 468 U.S. at 650, 104 S.Ct. 3262 (citing *Ferber*, 458 U.S. at 770, 102 S.Ct. 3348; *Broadrick*, 413 U.S., at 615, 93 S.Ct. 2908), is simply not an accurate statement of the law with respect to *Freedman* challenges. The standard used in *Regan, Ferber*, and *Broadrick*—all of which are overbreadth cases—is notably absent from *Freedman, FW/PBS*, and the lower court opinions interpreting those decisions. Under *Freedman*, Plaintiff does not bear the burden of showing § 10–110's consistent unconstitutional application. Rather, the burden in this case lies with Defendant to show that the absence of limits in § 10–110 has been corrected by a consistent Police Department practice of acting on permit applications within a brief and specified time.

sional practice of late notification. *See, e.g., Irish Lesbian and Gay Organization v. Giuliani,* 143 F.3d 638, 643 (1998), *and Irish Lesbian and Gay Organization v. Bratton,* 882 F.Supp. 315, 316 (S.D.N.Y.), *aff'd* 52 F.3d 311 (2d Cir.1995) (referring to the ILGO's February 23, 1995, decision to initiate suit because the group had not received any notice regarding a permit application for a March 17 event, even though the application had been filed on December 10, 1994). Fourth, Defendant's argument overlooks the fact that planning and publicity, central to the effectiveness and success of an event, may be hindered by last-minute uncertainty as to the event's location. Even if parade organizers know that a specific event will ultimately receive a permit for a particular date, excessive delay in informing them of the route can effectively limit their ability to advertise in advance and can thus lead to suppression of the event's message. (*See* Tr. Oral Arg. Nov. 4, 1998, at 13.)

Putting aside this danger that expression can be suppressed if applicants are granted permits too late in the process, an additional problem with Defendant's claim that the City has applied § 10–110 with *de facto* precision is the simple fact that, even when applicants are given adequate pre-event notice, there appears to be little formal structure to the Police Department's processes. In fact, when Plaintiff's counsel cross-examined the Police Department officials whose affidavits accompanied Defendant's Motion, both individuals repeatedly made statements showing the complete lack of firm guidelines governing Police Department consideration of permit applications. (*See* Centamore Dep. at 14 (finding "no time frame" for application processing when the event is several months

away); *id.* at 33 (stating that a permit denial "may be" or "may not be" communicated to the applicant faster than an approval: "Again, there is nothing written. There is no actual time frame for them[, the Borough Commanders,] to respond back to us."); *id.* at 39 (indicating that he was not aware of any deadlines in the permit application procedure aside from the requirement that applications be submitted at least thirty-six hours prior to the event); *id.* at 17–18; *id.* at 34; *id.* at 35; Cirillo Dep. at 9 (answering "No" when asked if he was aware of "any requirement in your administrative manual that would require the Police Department to take final action on a permit application within in a specified period of time"); *id.* at 10–12 (conceding that the main Police Department deadline is simply the date of the event itself); *id.* at 38–39 (acknowledging that the Police Department's "specific guidelines and procedures" for permit application processing do not include time deadlines); *id.* at 13–14 (indicating that he was not aware of any deadline for notifying the applicant once the Police Department decides to deny an application); *id.* at 15.) We presume that this lack of formal internal deadlines explains why some permit applicants experience delays in notification that exceed seven months,[15] six months,[16] five months,[17] or four months,[18] while others receive notice several months in advance of the event date.[19] (*See* Oct. 5, 1998, Centamore Aff.Ex. A; *see also* Pl's Opp. at 10–11 ("The application of the Federation of Hellenic Societies took 223 days to process, and the permit was issued 12 days before the proposed event. The Grand Parada Dominicana del Bronx application took 15 days to process, and the permit was issued 138 days before the event.").)

15. Application of Federation of Hellenic Societies of Greater New York.

16. Application of International Immigrants Foundation.

17. Applications of 369 Veterans' Association, National Puerto Rican Day Parade, and New York Road Runner's Club: Advil Mini Marathon.

18. Applications of Greater New York March of Dimes, International Society for Krishna Consciousness, and the Philippine Independence Day Committee.

19. Applications of Arts for Business (notice 122 days prior to event), Grand Parada Dominicana del Bronx (notice 138 days prior to event), Bronx Pride (notice 130 days prior to event), American Youth Hostels (notice 114 days prior to event), New York Road Runners Club: BX Half Marathon (notice 195 days prior to event), Bahamian American Cultural Society Incorporated (notice 141 days prior to event), Desfile Y Festival Latinos Unidos de New York (notice 155 days prior to event).

A scheme such as this one, where the Police Department may routinely grant applications either immediately or only after extensive delay, is dangerous precisely because it lacks consistency and predictability. The absence of standards, whether in the text of the statute or by the creation of consistent practice, hinders a reviewing court's ability to determine whether content-based considerations have infected the permit application process and results in a danger of censorship that the First Amendment does not tolerate. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Lakewood v. Plain Dealer Publ'g, Co.,* 486 U.S. 750, 763–64, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("[W]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker."). The Constitution requires explicit standards in order to limit the risk associated with any prior restraint. *See FW/PBS,* 493 U.S. at 226, 110 S.Ct. 596. These standards are not present in the text of the Ordinance and are similarly absent from any established Police Department practice.

Defendant has no persuasive response to the absence of time limits surrounding § 10–110 and its application. On multiple occasions, Defendant's Brief echoes the assertion that "the Police Department's longstanding practice and policy has been" to respond to permit requests "within a reasonable time." (Def's Mem. at 7; *see also id.* at 3, 12, 15, 17; Tr. Oral Arg. Nov. 6, 1998, at 3; Def's Reply at 6; October 5, 1998, Centamore Aff. at ¶ 7; October 5, 1998, Cirillo Aff. at ¶ 2). Defendant never defines the term "reasonable time," the Police Department lacks a uniform definition for that phrase, (*see* Centamore Dep. at 34 ("[U]sually reasonable is the opinion of the whoever [sic] is doing it. . . .")), nor can we discern the phrase's meaning from the evidence of permit applications discussed previously.

*Freedman* requires that delays be both (1) brief and (2) specified. *See Freedman v. Maryland,* 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). To state that the Police Department consistently acts on permits within a "reasonable time" begs the question with respect to the duration prong while entirely ignoring the specificity prong. That the Court in *FW/PBS* used the phrase "reasonable time" on several occasions does not mean that it intended to supplant the more specific language contained in *Freedman.*[20] Even were we to assume there had been some modification—an assumption further undercut by the Supreme Court's use of the *Freedman* "specified brief period" formulation only two years prior to *FW/PBS* in *Riley v. National Federation of the Blind,* 487 U.S. 781, 802, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988)—we note that the *FW/PBS* Court stated that "the licensor must make the decision whether to issue the license within a specified and reasonable time period"—thus retaining the specificity prong. *FW/PBS,* 493 U.S. at 228, 110 S.Ct. 596; *accord Baby Tam & Co., Inc. v. Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998). In short, "reasonable time" is a legal conclusion rather than an analytical tool. Its repeated use provides no insight into the presence, *vel non,* of a uniform, specified time-line for permit application processing under § 10–110. The standard, which Defendant's own affiant candidly admitted varies from one Police Department official to another, (*see* Centamore Dep. at 34), is patently insufficient to satisfy *Freedman*'s requirement of brief and specified restraints on expression.

### 3. Legal Result

■ Having considered all of Defendant's arguments and finding them to be without merit, we conclude that New York City Administrative Code § 10–110 is unconstitutional on its face. The text of the Ordinance fails

---

**20.** Defendant's Reply Brief quotes *Baby Tam & Co., Inc. v. Las Vegas,* 154 F.3d 1097 (9th Cir. 1998), to support the assertion that courts now interpret *Freedman* to require no more than "reasonable" time limits. (*See* Def's Reply at 6.) Use of the quoted passage alone is misleading. In the sentence immediately prior to that quoted

by Defendant, the Ninth Circuit stated the following: "A decision to issue or deny a license must be made within a brief, specified and reasonably prompt period of time." *Baby Tam,* 154 F.3d at 1100 (citing *FW/PBS,* 493 U.S. at 226, 110 S.Ct. 596; *Freedman,* 380 U.S. at 59, 85 S.Ct. 734).

to satisfy *Freedman*'s requirements and, despite sufficient opportunities to submit evidence, Defendant fails to persuade us that this defect has been cured by binding administrative guidelines, construction by the state courts, or consistent Police Department practice in implementation. Having determined that § 10–110 is unconstitutional, we leave to New York City the task of incorporating the appropriate safeguards to the parade permit application process. *See Freedman v. Maryland,* 380 U.S. 51, 60, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) ("How or whether Maryland is to incorporate the required procedural safeguards in the statutory scheme is, of course, for the State to decide.").

We note, however, that our ruling does not force the City to implement a procedure requiring the Police Department to grant or deny applications for a particular route far in advance of event dates. For instance, the Police Department could utilize a sliding scale whereby applicants are notified at set times in advance of an event depending on when the application was filed. Thus, the Department might be required to respond to applications filed more than ninety days prior to an event at least sixty days in advance of that event; applications filed between sixty-one and ninety days prior to the event would require notice forty-five days in advance of the event, *et cetera.* A permit granted at least forty-five days in advance of the event could be conditional and subject to revision if, within an interval ending thirty days before the event, some circumstance not present with the permit was granted rendered the location or route sought no longer appropriate. We agree with Plaintiff, however, that enough time must be allowed between definitive action on the permit application and the proposed event to enable the applicant to seek judicial relief. We have every confidence that the City can create a comprehensive set of specific deadlines that will neither hinder free expression nor force the Police Department to schedule events in the distant future.

Such a proposal is only one among many options that the City may choose to consider. We offer it merely to dispel the notion that the City is expected to act on a permit filed one year in advance of an event within a matter of days. Although speech may be suppressed by excessive delay in the notification process, we do not believe that speech is suppressed from the moment an application is filed until notification is received. Thus, within the regime created by the Supreme Court in *Freedman* and refined in *FW/PBS,* the City has the utmost latitude in fashioning a workable solution to the present dilemma. Moreover, such a solution will aid all parties and the courts by obviating the need for eleventh hour determinations whether dilatory processing of an application creates a "strong inference" of content based discrimination. (*October 22nd Coalition v. Safir,* 98 Civ. 7333(JSM), Tr. Oral Arg. October 21, 1998, at 3.)

### Conclusion

For the foregoing reasons, Defendant's Motion is denied and we grant Plaintiff summary judgment on the claim that New York Administrative Code § 10–110 is unconstitutional on its face.

SO ORDERED.

### Appendix

New York City Administrative Code

§ 10–110 Procession and parades.

a. Permits

A procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefor has been obtained from the police commissioner. Application for such a permit shall be made in writing, upon a suitable form prescribed and furnished by the department, not less than thirty-six hours previous to the forming or marching of such procession, parade or race. The commissioner shall, after due investigation of such application, grant such permit subject to the following restrictions:

1. It shall be unlawful for the police commissioner to grant a permit where the commissioner has good reason to believe that the proposed procession, parade or race will be disorderly in character or tend to disturb the public peace;

2. It shall be unlawful for the police commissioner to grant a permit for the use of any street or any public place, or material portion thereof, which is ordinarily subject to great congestion or traffic and is chiefly of a business or mercantile character, except, upon loyalty day, or upon those holidays or Sundays when places of business along the route proposed are closed, or on other days between the hours of six thirty post meridian and nine ante meridian;

3. Each permit shall designate specifically the route through which the procession, parade or race shall move, and it may also specify the width of the roadway to be used, and may include such rules and regulations as the police commissioner may deem necessary;

4. Special permits for occasions of extraordinary public interest, not annual or customary, or not so intended to be, may be granted by the commissioner for any street or public place, and for any day or hour, with the written approval of the mayor;

5. The chief officer of any procession, parade or race, for which a permit may be granted by the police commissioner, shall be responsible for the strict observance of all rules and regulations included in said permit.

b. Exemptions

This section shall not apply:

1. To the ordinary and necessary movements of the United States army, United States navy, national guard, police department and fire department; or

2. To such portion of any street as may have already been, or may hereafter be duly, set aside as a speedway; or

3. To processions or parades which have marched annually upon the streets for more than ten years, previous to July seventh, nineteen hundred fourteen.

c. Violations.

Every person participating in any procession, parade or race, for which a permit has not been issued when required by this section, shall, upon conviction thereof, be punished by a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment.