[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-14462

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 26, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-81142-CV-KLR

CAMERON FRAZIER,
through his mother
and next friend, Christine Frazier,

Plaintiff-Appellee,

versus

CYNTHIA ALEXANDRE,
individually, et al.,

Defendants,

JOHN WINN,
in his official capacity as
Commissioner of the Florida Department of
Education,
F. PHILIP HANDY,
in his official capacity as
Chairman of the Florida State Board of Education,
DONNA CALLAWAY,
T. WILLARD FAIR,
ROBERTO MARTINEZ,
PHOEBE RAULERSON,
LINDA TAYLOR,
KATHLEEN SHANAHAN,
in their official capacities as
members of the Florida State Board of Education,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____



Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON and PRYOR, Circuit Judges.


O R D E R:

The Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure; Eleventh Circuit Rule 35-5), the Petition for Rehearing En Banc is DENIED.


/s/ J L EDMONDSON<br>CHIEF JUDGE


2

BARKETT, Circuit Judge, dissenting from the denial of rehearing en banc:

An en banc rehearing is warranted because the panel's holding that the State of Florida can compel students to recite the Pledge of Allegiance in violation of their personal beliefs directly contravenes precedent that has been firmly entrenched for over 65 years, since West Virginia State Board of Education v. Barnette held that the State does not have the power to compel minor students to recite the Pledge to the flag. 319 U.S. 624 (1943).

The panel opinion finds facially constitutional a Florida statute that compels all students, including this 17-year-old plaintiff, to recite the Pledge unless they obtain written parental consent to exercise their First Amendment rights.[1] The panel opinion ignores Barnette and fails to apply the strict scrutiny required when this most fundamental of rights is being violated by the State. Such a "permission" requirement is patently unconstitutional and this opinion puts us at odds not only

---

[1] The pertinent part of Florida Statute § 1003.44(1) reads:

> The pledge of allegiance to the flag . . . shall be rendered by students standing with the right hand over the heart. The pledge of allegiance to the flag shall be recited at the beginning of the day in each public elementary, middle, and high school in the state. Each student shall be informed by posting a notice in a conspicuous place that the student has the right not to participate in reciting the pledge. Upon written request by his or her parent, the student must be excused from reciting the pledge.

3

with direct Supreme Court precedent but with the decisions of other circuits addressing similar statutes.[2]

To avoid the dictates of <u>Barnette</u>, the panel mischaracterizes the issue as one involving the resolution of conflicting constitutional rights between parents and children. This recharacterization is wholly unpersuasive, as it is undisputed that no such conflict exists in this case. It is also extremely unlikely that some hypothetical case would emerge where a minor student might sue the State through a non-parental next friend after his parents refused him permission to remain silent; in essence, such parents would be demanding that the State force their child to violate his conscience.

In addition to its failure to apply strict scrutiny, the panel opinion completely disregards other established constitutional principles. Notwithstanding that it is beyond peradventure that minors have constitutional rights, the panel opinion fails to consider them, much less to weigh them. Compounding this error, the panel overlooks the fact that the State cannot do indirectly what it cannot do directly.

---

[2] <u>See</u> <u>Circle Schools v. Pappert</u>, 381 F.3d 172 (3d Cir. 2004) (applying strict scrutiny to, and holding unconstitutional, a requirement that a parent must be notified if a child chooses not to say the pledge); <u>Sherman v. Cmty. Consol. Sch. Dist. 21</u>, 980 F.2d 437 (7th Cir. 1992) (holding that a school may have its classes recite the Pledge so long as it does not compel pupils to espouse its content); <u>Goetz v. Ansell</u>, 477 F.2d 636, 637–38 (2d Cir. 1973) (holding that a student has the right to remain quietly seated during the Pledge). <u>See also</u> <u>Elk Grove v. Newdow</u>, 542 U.S. 1, 8 (2004) ("Consistent with our case law, the school district permits students who object on religious grounds to abstain from the recitation.") (citing to <u>Barnette</u>, 319 U.S. at 624).

Because the State itself cannot compel speech, it lacks the capacity to delegate to parents the power to compel this speech. In trying to justify the State's impermissible delegation of power, the panel further errs when it claims that a parent's "fundamental right of upbringing" is even implicated, much less permits the State's action.[3]

In light of the fundamental nature of the student right at issue and the absence of any "countervailing" parental right, it is not surprising that no court has ever required parents to consent to a minor's exercise of his or her constitutional rights of conscience. Students possess basic rights of belief and expression under the First Amendment independent of their parents, and the panel has, without any supportable legal reason, wrongfully deprived students of those rights. These concerns are more fully discussed below.

**I. Supreme Court Precedent Dictates that Students Cannot
Be Compelled to Recite the Pledge of Allegiance**

In <u>Barnette</u>, the West Virginia Board of Education passed a resolution requiring students to salute the flag and recite the Pledge of Allegiance at school. The Supreme Court recognized that this compulsion infringed on the <u>students'</u>

---

[3] In the absence of any support for a parent's "right" to prohibit a minor's exercise of his or her freedom of speech, belief and conscience—and therefore no anchor with which the panel can legitimately ground its "parent-child" interpretation of the Pledge statute—it becomes even more untenable to argue that <u>Barnette</u> is inapplicable.

rights of conscience, and thus, found the law unconstitutional. There is no distinction between the rights of students in West Virginia schools and the rights of students in Florida schools.[4]

The Barnette Court acknowledged the obvious fact that "[the] Pledge requires affirmation of a belief and an attitude of mind." Id. at 633. The Court then recognized that to permit the State to compel the Pledge would require a complete abdication of the First Amendment. To sustain the State's position, the Court would be "required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." Id. at 634. This position would be untenable and the Court emphatically rejected it:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

> We think the action of the local authorities in compelling the flag salute

---

[4] The Court also made clear that, while the case may have been brought by Jehovah's Witnesses, its reach extended beyond any religious objection:

> Nor does the issue as we see it turn on one's possession of particular religious views or the sincerity with which they are held. While religion supplies appellees' motive for enduring the discomforts of making the issue in this case, many citizens who do not share these religious views hold such a compulsory rite to infringe constitutional liberty of the individual.

Id. at 634–35.

and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.

Id. at 642. The Florida statute at issue would compel the very same students in Barnette to first obtain permission to do that which the Supreme Court has already explicitly ruled they have a constitutional right to do.

The panel opinion's effort to distinguish Barnette and its progeny[5] on the basis that "in those cases, the custodial parent was not opposing the child's choice" whereas here there is a potential conflict between parent and child[6] is unavailing on many levels. First, as noted, there is no conflict in this case as the suit against the State was brought by the student's mother on his behalf. The panel opinion makes no mention of this fact nor addresses its significance.

Moreover, nothing in the Supreme Court's elucidation of the core free speech principles and rights of the students in Barnette can be construed to depend on the permission of their parents. But even if that distinction were relevant, we are obligated to deal with such a tension through a balancing analysis of the students' free speech right guaranteed by Barnette against whatever purported rights (and their sources) parents may have to compel their children to violate their

_____

[5] See Holloman v. Harland, 370 F.3d 1252 (11th Cir. 2004); Banks v. Bd. of Pub. Instruction, 314 F. Supp. 285 (S.D. Fla. 1970), vacated by 401 U.S. 988 (1971), reinstated without published opinion by dist. ct. and aff'd, 450 F.2d 1103 (5th Cir. 1971).

[6] Frazier, 535 F.3d 1279, 1284 (2008).

7

conscience.[7]  This court cannot simply dismiss Barnette outright without any

consideration of the students' rights.

The panel not only avoids the conclusion directly dictated by the specific

precedent of Barnette but commits a broader error by failing to mention, much less

apply, the strict scrutiny required before the State can be permitted to infringe upon

a fundamental right.  The panel instead erroneously asserts that the plaintiffs have

brought an overbreadth challenge.  This doctrine—requiring that the statute

prohibit "a substantial amount of protected speech" before it can be deemed

facially invalid, United States v. Williams, 128 S. Ct. 1830, 1838 (2008)—is

inapposite both in application and rationale.[8]

---

[7] I do not believe there is any existing authority for such a parental right, as I discuss in greater depth in part III.

[8] The overbreadth doctrine is applied to laws that curtail or prohibit speech, not laws where the State compels individuals to say things that might contravene their most deeply-held beliefs. The rationale underlying its application is to balance harms, as the Supreme Court recently explained when applying the doctrine in a case that criminalized the solicitation of child pornography:

> The [overbreadth] doctrine seeks to strike a balance between competing social costs. On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects.

Williams, 128 S. Ct. at 1838.  The nature of this balancing inherently requires that the speech to be curtailed is somehow detrimental, such as in the dissemination of pornography or the use of "fighting words," which might trigger public disturbances or protesting where a purportedly greater harm might result.  Here, it harms no one for an individual to refrain from speaking as a matter of conscience.  The result is that by compelling this speech, the State is not simply

8

This statute is not prohibiting speech; it is compelling speech against one's conscience. Whether one calls it "the right not to speak" or "liberty of conscience," the freedom to think and hold beliefs that do not comport with state orthodoxy is a basic part of this nation's foundation; yet this core tenet of our Founding Fathers is rendered hollow if the State can force individuals to espouse that with which they disagree. See, e.g., Everson v. Bd. of Educ., 330 U.S. 1, 15–16 (1947) ("The 'establishment of religion' clause of the First Amendment means at least this: Neither a State nor the Federal Government can . . . force [a person] to profess a belief or disbelief in any religion."); Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 791 (1988) ("'The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion.' To this end, the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners.") (internal citations omitted) (emphasis added).

This sacred right may be violated, if ever, only for the most compelling of state justifications. For that reason, strict scrutiny has been applied not just in Barnette but in cases of speech compulsion generally, and should be applied here.

---

reducing the flow of ideas but manipulating the marketplace of ideas without a clear legitimate purpose. Such compulsion must be analyzed under the strict scrutiny test.

9

See Barnette, 319 U.S. at 639 ("[First Amendment rights] are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect."); Wooley v. Maynard, 430 U.S. 705, 716 (1977) (asking "whether the State's countervailing interest is sufficiently compelling to justify requiring [people] to display the state motto on their license plates" and finding that the state of New Hampshire could not punish individuals who covered up "Live Free or Die" on their license plates because it was repugnant to their moral, political, and religious beliefs) (emphasis added); Pac. Gas & Elec. Co. v. Pub. Util. Com'n of Cal., 475 U.S. 1, 16–17 (1986) ("For corporations as for individuals, the choice to speak includes within it the choice of what not to say. . . . [T]he government may not impose [its regulations] absent a compelling interest.") (emphasis added); Riley, 487 U.S. at 796, 798 (stating that the "lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon" and applying "exacting First Amendment scrutiny").

The Pledge statute cannot survive a test asking whether the State has a compelling interest to infringe on the rights of conscience because "[the State's interest in disseminating an ideology] cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." Wooley, 430

10

U.S. at 717. Although some compelling reasons might exist that could support the curtailment of a constitutional right of free speech, there are none in this case: "Neither our domestic tranquility in peace nor our martial effort in war depend on compelling little children to participate in a ceremony which ends in nothing for them but a fear of spiritual condemnation." Barnette, 319 U.S. at 644 (Black, J. and Douglas, J. concurring).[9]

## II. The State Cannot Do Indirectly What It Cannot Do Directly

This case is not about whether parents, on their own, can require their children to recite the Pledge of Allegiance, but whether the State can burden a clear First Amendment right either by requiring consenting parents to give permission before their children may exercise their constitutional rights or by using non-consenting parents to compel the expression of beliefs that students do not hold.

---

[9] An overbreadth analysis focuses on the content of the speech, not the age or characteristics of the speaker. But even if one were able to apply the doctrine by somehow determining which students would experience an unconstitutional burden on speech, the statute is still facially unconstitutional. A statute that compels speech violative of an individual's conscience and that reaches millions of Florida public school students (including 798,091 Florida high-schoolers) surely infringes on a "substantial amount of protected speech." See http://www.fldoe.org/eias/eiaspubs/pdf/pk-12mbrship.pdf (last visited November 21, 2008).

As even the panel acknowledges, the type of speech the statute covers is wholly-protected subject matter as to older students. Frazier, 535 F.3d at 1285 ("[T]he balance of parental, student, and school rights might favor the rights of a mature high school student in a specific instance . . . ."). Accordingly, the statute must be "overbroad" because it unconstitutionally burdens an entire group of students—in this case, older students. See, e.g., Riley, 487 U.S. at 801 ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.").

11

The panel's resolution ignores both minors' established constitutional rights and the State's incapacity to delegate to parents any power to infringe on those rights.

The State is required to respect and uphold the constitutional rights of minors, which cannot be ignored regardless of whether a parent might disagree with the exercise of those rights.[10] The panel opinion gives lip service to the principle that minors possess constitutional rights, but asserts that those rights are trumped by the parents' wishes. Frazier, 535 F.3d at 1285. This is simply not true as the Supreme Court made clear in Planned Parenthood v. Danforth when it established that parents cannot infringe on a minor's constitutional privacy right to obtain an abortion. 428 U.S. 52 (1976).

---

[10] In Re Gault established that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." 387 U.S. 1, 13 (1967). The Supreme Court reiterated the principle that minors have independent First Amendment rights in the very context of the school setting:

> Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

Tinker v. Des Moines Indep. Cmty Sch. Dist., 393 U.S. 503, 511 (1969). See also Bellotti v. Baird, 443 U.S. 622, 633 (1979) (plurality) ("A child, merely on account of his minority, is not beyond the protection of the Constitution."); Planned Parenthood v. Danforth, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority.").

12

Moreover, this statute in its operation delegates a right to the parent that the State constitutionally cannot itself possess.  The State cannot give what it does not have.  The Danforth Court focused on the State's lack of delegatory power when it struck down the provisions of a state law requiring both spousal consent for an adult  and parental consent for a minor before a woman could proceed with an abortion during the first trimester of pregnancy:

> [T]he State may not constitutionally require the consent of the spouse, as is specified under § 3(3) of the Missouri Act, as a condition for abortion during the first 12 weeks of pregnancy. . . . [T]he State cannot "delegate to a spouse a veto power which the state itself is absolutely and totally prohibited from exercising during the first trimester of pregnancy."  Clearly, since the State cannot regulate or proscribe abortion during the first stage, when the physician and his patient make that decision, the State cannot delegate authority to any particular person, even the spouse, to prevent abortion during that same period.

428 U.S. at 69 (internal citation omitted) (emphasis added).  While recognizing the extremely important concerns of a husband in this most difficult of decisions, the Court nonetheless reiterated:  "[W]e cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit the wife from terminating her pregnancy, when the State itself lacks that right."  Id. at 70 (emphasis added).  Especially analogous to this case, the Danforth Court then applied the same rationale to the written parental consent requirement:

> [A] state may not impose a blanket provision requiring the consent of a parent or person in loco parentis as a condition for abortion of an

13

unmarried minor during the first 12 weeks of her pregnancy. Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent.

Id. at 74.

Thus, even when there was a clear conflict between the wishes of the parent and a minor, the Court protected the separate and independent constitutional privacy right of the minor to an abortion and prevented the State from delegating a power it did not have. A minor's right to express an act of conscience is just as worthy of protection as a minor's constitutional right of privacy to obtain an abortion.[11]

### III. A Parent's "Right of Upbringing" Cannot Be Used As Justification For State Involvement

The panel asserts that the State's "vindication" of the parental "right of upbringing" can serve as a justification for the State's passage of this statute.[12]

---

[11] It also bears reemphasizing that this opinion completely ignores the burden placed by the State on the exercise of a clearly established constitutional right when there is no conflict (as in this case). As noted earlier, the statute forces students whose parents are in agreement with their desires to still seek parental permission to exercise a right that Barnette has already established they have. Without the consenting parent's written permission, any administrative discipline would be available to sanction non-compliance with this statute, including expulsion from school. The unnecessary burdening of the exercise of this constitutional right is not permissible.

[12] See Frazier, 535 F.3d at 1285 & n.6 ("Although we accept that the government ordinarily may not compel students to participate in the Pledge, e.g., Barnette, we also recognize that a parent's right to interfere with the wishes of his child is stronger than a public school official's right to interfere on behalf of the school's own interest. . . . [The State has a] legitimate interest in

14

This claim seriously misunderstands the nature of that right. The parental right of upbringing is not a positive right that gives parents the power to <u>invoke</u> the aid of the State against a minor's exercise of constitutional rights but a negative right that provides for protection of that right <u>against the State</u>. The cases upon which the panel relies in an attempt to establish a positive right are completely inapposite. The panel roots its (mis)conception of this right in the proposition that the due process clause of the Fourteenth Amendment encompasses the right to "direct the education and upbringing of one's children." <u>Frazier</u>, 535 F.3d at 1284 (citing to <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997)). This principle is not disputed; it is just not relevant to the case at hand.

Every case that has ever discussed the issue of "parental upbringing" dealt with the conflict between a parent's right and <u>a State's</u> attempted curtailment of that right, not a conflict between parent and child. In the pertinent discussion in <u>Glucksberg</u>, to which the panel cites, the Supreme Court was reviewing the scope of the fundamental due process liberty right, including the parental right to direct the education of one's children. The Court discussed the two seminal cases establishing this right: <u>Meyers v. Nebraska</u>, 262 U.S. 390 (1923), which ruled in favor of a parental challenge against the State, overturning a state statute that forbade German from being taught in school, and <u>Pierce v. Society of Sisters</u>, 268

protecting the rights of all parents on the question of the Pledge.").

15

U.S. 510 (1925), which ruled in favor of a parental challenge against the State, overturning a statute requiring all minors to attend public schools as opposed to private or parochial schools. Wisconsin v. Yoder, to which the panel directly cites, overturned state legislation mandating compulsory school attendance until the age of sixteen because it violated two liberty interests maintained by members of the Amish community: the students' "fundamental rights . . . specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children." 406 U.S. 205, 214 (1972).[13]

Not only are these cases inapposite to the panel's opinion because they were not about parent-child conflict, but none involved a parent's right to enlist state aid generally, let alone enlist that aid to purposely trump the constitutional right of a minor. Nor can the panel cite any case that does so.[14] Even assuming arguendo that parents did have the authority to infringe upon all minors' First Amendment rights as private actors, enlisting state enforcement would trigger the state action

___

[13] Ayotte v. Planned Parenthood, 546 U.S. 320 (2006), to which the panel also cites, is not applicable either. Ayotte simply requires parental notification of a proposed abortion, and even if the parent disagrees with the minor, she can still have the abortion after the notice period. Moreover, there is a judicial bypass procedure which "must [be] authorize[d] if he or she finds that the minor is mature and capable of giving informed consent." 546 U.S. at 324.

[14] The only way this right might be implicated is if the State required all students to recite the Pledge and some parents did not want their children to participate. If the State gave parents no means to opt their children out, perhaps then objecting parents would have a right to assert against the State that such a statute violates their fundamental right of upbringing. But that scenario is neither relevant, nor even possible, under the current Pledge statute.

16

restriction of the First Amendment. Thus, even if such a hypothetical parent-child First Amendment conflict did exist, a private individual could not harness the power of the State to take any action that would directly violate another individual's constitutional right. See, e.g., Shelley v. Kraemer, 334 U.S. 1, 22 (1948) ("The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals.") (emphasis added).

This is not a case pitting the rights of parents against children with the State as mediator but rather a prototypical example of the assertion of State power against the rights of their citizens—in this case, those of students. And the right to exercise one's conscience in not reciting the Pledge lies solely with the individual student, not with the parents of that student and certainly not with the State. This is no less true today than it was in 1943:

> Words uttered under coercion are proof of loyalty to nothing but self-interest. Love of country must spring from willing hearts and free minds, inspired by a fair administration of wise laws enacted by the people's elected representatives within the bounds of express constitutional prohibitions. These laws must, to be consistent with the First Amendment, permit the widest toleration of conflicting viewpoints consistent with a society of free men.

Barnette, 319 U.S. at 644 (Black, J. and Douglas, J. concurring).

17

I believe this opinion is demonstrably wrong and merits en banc

consideration